FEHLHABER CORPORATION AND HORN CONSTRUCTION CO., INC., a
Joint Venture, Respondent-Appellant, v STATE OF NEW
YORK, Appellant-Respondent. (Claim No. 50837.)

Third Department, December 7, 1978

## APPEARANCES OF COUNSEL

*Louis J. Lefkowitz, Attorney-General (Richard J. Dorsey* and *Ruth Kessler Toch* of counsel), for appellant-respondent.

*De Graff, Foy, Conway & Holt-Harris (William F. Conway* and *Thomas O. Kellogg* of counsel), for respondent-appellant.

## OPINION OF THE COURT

MIKOLL, J.

Fehlhaber Corporation and Horn Construction Co., Inc., a joint venture, on its low bid of $37,377,353.40 was awarded a public contract for the construction of the main platform foundation at the South Mall Project. The unit price contract entered into on July 5, 1966, provided for a September 1, 1968 completion date. About June 1, 1968, it became apparent that the contract work would not be completed as originally specified and the parties began discussions which culminated in February, 1969, in the signing of a modification agreement, dated and effective as of October 1, 1968. The new agreement provided that all work performed after October 1, 1968 was to be paid on a cost plus fixed fee basis and extended the completion date until March 1, 1970. The modification agreement contained a reservation by the claimant of its right to submit certain claims for damages arising out of the original contract period but limited the State's liability for such claims to $1,200,000. Subsequently, the parties entered into a supplemental agreement, dated February 28, 1970, which increased the fixed fee, deleted a portion of the contract work and, again, extended the completion date until December 31, 1970. On April 30, 1971, the State and claimant, by mutual consent,

terminated the agreement and the remaining work was transferred to the Walsh-Corbetta Company.

The claimant was paid the total sum of $68,960,837.70 for work performed under the original contract and the subsequent agreements.

The contract for the foundation work was one of many construction contracts involved in the construction of the South Mall Project. A superstructure was to be erected on the foundation. Although, when claimant's contract was awarded, the superstructure contract had not been let, the State elected to proceed with the foundation work under a "fast tracking" plan. "Fast tracking" was a procedure whereby the State would let certain contracts as soon as the design for them was completed without waiting for the design of the entire project to be completed. The State thereby hoped to economize and blunt the effects of inflation by the early performance of such contracts. At the time the claimant performed its contract, other contractors were also performing work at the site.

Claimant did the pile driving work and subcontracted the excavation work, the reinforcing steel work and part of the concrete work. The pile driving was virtually completed on schedule. However, only 41% of the concrete work was finished as of the original completion date. Approximately two thirds of the total work was performed by the September 1, 1968 completion date.

In its claim filed March 31, 1969, claimant sought $6,000,-000 in damages alleging that the State caused various delays and breached the original unit price contract. In particular, the claim alleged that the State: (1) failed and neglected to supervise progress and co-ordinate the work of other contractors performing work at the site; (2) made extensive changes and revisions in the plans and drawings for the work to be performed which were far beyond the amount and kind of changes to be reasonably anticipated; (3) failed to deliver to claimant physical access to large portions of the work areas on the project site; (4) caused further delays in claimant's work by making changes in the mechanical and electrical installations; (5) made design changes in the foundation contract plans and specifications; (6) caused claimant further delay by taking an unreasonable time for processing and approving shop drawings; and (7) improperly rejected certain of claimant's work as being improper and unsatisfactory and compelled claimants to redo such work.

Claimant alleged the delays, design changes and interference resulted in four general categories of damages designated as claim items: (1a) bar reinforcement: (1b) concrete and forms [subcontractors]; (1c) concrete and forms [contractor]; (2) unreimbursed overhead; (3) misclassification of excavation; and (4) change order allowances. An additional claim item for rescinded pumping payments is not involved on this appeal.

The Court of Claims in its decision found that there was proof of "three major sources of delay interference and failure to coordinate": numerous changes of design, failure to remove or relocate existing utility installations, and failure to give claimant access to work areas. The trial court apportioned responsibility for the delays and found the State to be liable for 75% of the damages caused by the delays and the claimant to be responsible for 25%. The court found that the claimant incurred increased costs in the amount of $2,896,503 because of the delays and interferences and reduced this amount by 25% to reflect its finding on apportionment. The court further reduced the award to $1,200,000 plus interest in giving effect to the limitation of liability clause contained in the modification agreement.

The Court of Claims applied the 75%-25% apportionment forumula to claim item (1a), bar reinforcement (with two exceptions); claim item (1c), contractor's concrete and forms; and claim item (2), unreimbursed overhead. The court awarded the full amount under claim item (4), change order allowances, without applying the apportionment formula. The court rejected claim item (1b), the subcontractor's concrete and forms, and claim item (3), misclassification of certain excavation work.

A—LIABILITY:

■ On this appeal the State contends that the Court of Claims erred in finding that the State breached its contract with claimant by interfering with claimant's performance (1) through an excessive number of design changes; (2) in failing to grant access to areas within which claimant was required to perform work, and (3) in failing to remove utility lines. We disagree.

The trial court properly found, on the evidence adduced at trial, that the State breached its contractual duty to provide claimant with a reasonable opportunity to perform its work without interference or obstruction from the State. This court has stated the applicable law with respect to public construc-

tion contracts as follows: "The rule is well established that a contractor is entitled to a reasonable opportunity to perform his contract without obstruction or interference and that the State may be held liable for failure to furnish such opportunity unless it has relieved itself by express language in the contract [citation omitted]". *(Peckham Road Co. v State of New York,* 32 AD2d 139, 141, affd 28 NY2d 734.)

The claimant must prove his claim by a fair preponderance of the evidence *(Zara Contr. Co. v State of New York,* 7 AD2d 956, 957-958, mot for lv to app den 7 NY2d 706).

I. EXCESS NUMBER OF DESIGN CHANGES:

The evidence established that the State's so-called "fast tracking" plan of construction required numerous design changes. When the bids on the superstructure came in too high, they were rejected. The State then redesigned the superstructure at the same time claimant was performing the foundation work. The ensuing superstructure design changes ultimately necessitated design changes in the foundation work. Moreover, prior to bidding, the contractor planned the job from contract drawings received from the State. Shop drawings detailing the work to be done were prepared from the contract drawings. Thus, changes in the contract drawings necessarily involved the shop drawings.

Claimant's chief witness, Mr. Winterberg, testified to the problems created by the revision of contract drawings which were revised 266 times prior to the original contract completion date of September 1, 1968. The State contested the significance of these revisions but offered no evidence on the issue. The trial court's finding that the shop drawing revisions constituted a delay in and of themselves is well founded. There were 118 revisions of 18 pile shop drawings; 2,000 revisions of rebar detail drawings and 526 revisions of 350 other shop drawings of the claimant. Further, Mr. Winterberg testified that the major problem with these drawings was the inordinate time it took to process them. It was shown that the State required 45 days on the average to process concrete work shop drawings which usually, at other construction jobs, were returned to the contractor within a week. The State contends that the average return time for the first submission was 12.7 days and that the revisions after the first submission were attributable to the claimant. However, the State offered proof of only one case out of 55 concrete drawings where the resubmission was the fault of the claimant. Despite its conten-

tion to the contrary, the State did not present adequate probative evidence to show that any material delay in processing such shop drawings was the fault of the claimant.

The State also contends that, based on a "lead time" theory, the number of revisions and the time consumed in the approval process did not delay the claimant's performance. The State's chief witness testified that as long as revisions to drawings were made more than 30 days prior to the driving of piles or more than 120 days before concrete was to be poured, the revisions would not interfere with claimant's performance. The witness stated that he formulated this theory on the basis of his professional experience. No evidence or authority was presented in substantiation of the theory. The argument was properly rejected by the trial court.

II. FAILURE TO GRANT ACCESS TO WORK AREAS ON JOB SITE:

■ The trial court found that based on "holds" placed on various sections of the contract site, the State interfered with claimant's work progress by failing to grant access to some areas of the work site. In alleging that the court erred, the State maintains that claims for some of the areas were released in paragraph 11 of the modification agreement and that the proof was inadequate to establish that delays resulted from nonaccess. These contentions are without merit. We do not reach this conclusion because of the failure of the State to plead the release clause as an affirmative defense as required by CPLR 3018 since the State, at the time this claim was commenced, was not required to file an answer. However, the State had ample opportunity to raise such affirmative defense at the trial and failed to do so. It may not do so for the first time on appeal (*Mulligan v Lackey*, 33 AD2d 991, 992).

The trial evidence was sufficient to support the findings of the trial court. The proof revealed that the major reason for the "holds" was the revision of drawings. Furthermore, there was evidence that another cause of nonaccess was falling debris and that the State was unable to control the actions of the contractor for the Office Tower.

■ The State additionally argues that the terms of the unit price contract provided the contractor with knowledge that delays in the completion of the foundation work around the Office Tower were to be anticipated and that the unit prices were to make allowance for such. However, as noted above, the obligation to furnish the contractor with an unobstructed site is implied in every construction contract (*Peckham Road*

*Co. v State of New York,* 32 AD2d 139, affd 28 NY2d 734, *supra).* Delays in furnishing the site are actionable if they are not within the contemplation of the parties. The record reveals no evidence that the parties herein anticipated this type of delay, i.e., the intentional throwing and dropping of objects off the Office Tower.

III. FAILURE TO REMOVE UTILITY LINES:

The Court of Claims found that the failure to remove or relocate existing utility installations from within the former city streets of the South Mall Project, was a source of interference. The State again claims for the first time in the litigation that paragraph 11 of the modification agreement also bars any recovery for interference resulting from the utilities and, further, asserts that the proof is inadequate to establish that delay resulted from the utility interferences. We reject both contentions.

■ As we have noted previously, in relation to the areas of nonaccess, the affirmative defense of release under the modification agreement, should have been raised during the trial and cannot be interposed for the first time on appeal.

The proof of the existence of certain utility lines at the site is found in correspondence contained in Book "A" and in the testimony of claimant's chief engineer who testified that the utility lines became a problem after two or three months, interfering with the contractor's planned operations. The evidence established the State did not act to remove active utility lines as the contract required. The State objected that the correspondence, relied on by the Court of Claims in its decision, was incomplete. The letters which were not included, however, were letters written by the State, and copies would have been in the possession of the State. The State could have offered copies in evidence if such were relevant or material to the State's position. Instead, the State offered no direct evidence on the issue of active utility lines.

■ In summary, on the issue of delay and interference, we note that if the situations which caused the delays were contemplated by the parties at the time of the bidding, there can be no liability imposed upon the State. Here, neither the contract provisions relating to nonaccess and utility lines, nor any information which the claimant was shown to possess at the time of bidding, deal specifically with the possibility of delay in respect to the (a) redesign of the superstructure; (b) active utility lines; or (c) *deliberate* interference from other

contractors, under the control of the State. There can be no denial of liability on the theory that such delays thereby caused were to have been contemplated by the claimant. The proof offered by claimant adequately demonstrated that the State breached its contract with the claimant.

B—CLAIMANT'S APPEAL:

■ We now consider claimant's primary contention asserted on its appeal, that is, that the limitation of liability clause contained in the modification agreement is unenforceable because, allegedly, the claimant signed the agreement as a result of economic duress. We disagree. The record established that the terms of the final agreement were the result of protracted negotiations. The claimant made a choice. The fact that claimant "may have been financially constrained to accept less than the true value of * * * [its] alleged damages does not constitute economic duress (see *Oleet v Pennsylvania Exch. Bank,* 285 App. Div. 411)." *(Muller Constr. Co. v New York Tel. Co.,* 50 AD2d 580, 581, affd 40 NY2d 955.) The final agreement containing the $1,200,000 maximum liability clause was the result of compromises by both parties and not economic duress.

Claimant concedes that if the limited liability clause is enforceable, then its remaining points raised on its appeal are moot. Consequently, we do not reach the question whether the Court of Claims properly found the claimant 25% liable for the delays except as discussed below nor whether the dismissal of the claim of appellant for misclassification of excavation was erroneous.

C—DAMAGES:

■ The trial court correctly held that the proper method of computing damages for breach of a contract terminated prior to completion is *quantum meruit (Garvin Mach. Co. v Hutchinson,* 1 App Div 380). The Court of Claims, after hearing the evidence, determined that 75% of the fault for the delays in the performance of the work was attributable to the State and that 25% was attributable to the claimant. The court in arriving at this liability formula recognized that it was imprecise, observing that "the apportionment of damages is not an exact science." The State contests the apportionment formula utilized by the court and urges this court to make new findings of the percentage of fault ascribed to the State. We see no reason to disturb the trial court's finding. It is well settled that where the trial court's apportionment of liability

can be reasonably supported by the evidence, it should not be disturbed *(Rusciano Constr. Corp. v State of New York,* 37 AD2d 745, 747). The Court of Claims carefully detailed all of the factors which led it to conclude that the State was 75% liable for the delays.

■ Under claim item 1-a the Court of Claims awarded claimant damages for added costs for steel bar reinforcement work. We affirm this award. Claimant placed only 41% of the reinforcing steel during the life of the original unit price contract but it expended 100% of the equipment and operator costs. In computing its damages for the use of three cranes and two bending machines required for the work at the site, claimant used rental rates published in the Associated Equipment Dealers' Manual (AED) although it owned the machines. The State argues that this was an artificial cost pointing to the modification agreement under which claimant agreed to provide equipment at 75% of the AED rates. This argument is not persuasive. There was testimony that the AED rates were an accepted method of computing the rental value of company owned equipment and the company charged such rates in renting out its own equipment. Moreover, when the 7% fixed fee is added to the 75% rental charged under the modification agreement the actual rate then becomes 82%.

The more acceptable procedure would have been for claimant to have provided information on its cost allocation for equipment (see *Bero Constr. Corp. v State of New York,* 27 AD2d 974). However, the fair and reasonable rental value of owned equipment has been recognized as an acceptable measure of damages *(Shore Bridge Corp. v State of New York,* 186 Misc 1005, 1016, affd 271 App Div 811).

Claim item 1-c involved concrete work performed by claimant after it took over from its concrete subcontractor on January 1, 1968. It was awarded damages for the difference between the cost of its concrete operation and the payments made by the State from that date until October 1, 1968. The trial court, after applying the 75%-25% apportionment formula, awarded the claimant $806,218.40. As with the steel reinforcing bars, the claimant had expended 100% of its operating costs to complete only a portion of the work. The State argues the award is improper since it is based on figures provided by the claimant. However, the State introduced no evidence that different figures would more accurately reflect the cost incurred by claimant, but merely introduced evidence

that claimant started the concrete work late and experienced certain difficulties in performing the work, matters the trial court had considered in determining the apportionment of liability formula.

The State next urges that the trial court awarded the contractor's overhead and profit expenses for equipment used in concrete work twice. The equipment cost was $178,988.88 to which a 10.47% overhead allowance and a 10.47% profit allowance were added. The claimant used AED rates to compute the value of the use of its own equipment and the AED rates include the contractor's overhead and profit. However, since only 20.94% of the $178,988.88 or $37,480.27 is involved, the issue is rendered moot because the limitation of liability clause limits damages to $1,200,000 and after deduction of the $37,480.27, in view of our other holdings on this appeal, claimant would still be entitled to an award in excess of the $1,200,000 limitation.

The State challenges the trial court's award of $60,713.25 allowed under the claim item 1-a for unreimbursed work orders. The State maintains the claimant failed to prove that the extra work was required because of delays caused by the State. However, this issue is also academic in view of our determination of other issues on this appeal since, similarly as with the issue of concrete equipment expense, after deduction of the $60,713.25, claimant would still be entitled to damages in excess of $1,200,000.

Under claim item 2, the Court of Claims awarded claimant $1,088,202.62 for unreimbursed fixed costs and overhead incurred in the performance of the contract work up to October 1, 1968, when the modification agreement became operative. The trial court found claimant had performed only 75% of the contract due to interference by the State but, in doing so, had expended all of the moneys it allocated under the unit price contract for fixed costs and overhead. Nine million dollars of the work under the $37,000,000 original unit price contract was unperformed as of October 1, 1968 although claimant assembled enough equipment to complete the entire job as scheduled. Thus, claimant incurred fixed costs and overhead because of the presence of this equipment even though it was not being utilized to its capacity.

Claimant determined its fixed and overhead costs incurred for the entire work by multiplying the unit price by 4.76% in the case of fixed costs and 10.47% in the case of overhead

costs. This produced a claim in the amount of $1,414,000 for these items. The claim embraced three categories: (1) general conditions, fixed labor costs, $851,000; (2) miscellaneous field costs, $378,000 and (3) bond costs, $185,000.

On appeal the State contends that the cost-plus modification agreement was intended to cover claimant "for all its costs of completing the then unperformed work" and argues that the claimant is being reimbursed twice for the same fixed costs and overhead, once for the unperformed work and again when the work was performed under the modification agreement. We reject the State's contention. The fixed costs and overhead were, in fact, incurred twice. Once in the performance of the original contract when, due to delays caused by the State the full allocation for fixed costs and overhead was expended to accomplish only 75% of the contract work. The second time in the actual performance of the work under the cost-plus modification agreement. Thus, the award reimbursed claimant for expenses actually incurred.

The State also argues that the 10.47% used to compute the amount awarded for central office overhead and administration is unsupported by any explanation and is, therefore, speculative. We disagree. The claimant introduced evidence in support of its use of this figure. The State had audited the claimant's books and records but never offered any evidence in rebuttal. Under such circumstances, the trial court may properly credit the oral testimony offered by claimant (*D'Angelo v State of New York,* 46 AD2d 893, affd 39 NY2d 781). Furthermore, an allowance of 10% for overhead has been found to be fair and reasonable compensation (*A. E. Ottaviano, Inc. v State of New York,* 202 Misc 532, 536).

D—THE INTEREST AWARD:

■ The State maintains that interest was improperly awarded to claimant and argues that the interest should not have commenced running until shortly the date of the last application for payment, January 11, 1971. The court below awarded interest as of January 1, 1969, three months after claimant's cause of action for breach of contract accrued on October 1, 1968. The rule is that the State is entitled to a reasonable time after the action accrues to determine the amount due to the claimant (*Terry Contr. v State of New York,* 23 NY2d 167, 172; *Tennessee Gas Transmission Co. v State of New York,* 32 AD2d 71, 78, affd 27 NY2d 608). According to testimony offered by claimant it was possible for

the State to determine by December 31, 1968 what work had been performed prior to October 1, 1968. The evidence demonstrated that the State had a reasonable time to discover the amount owing to claimant. The interest award is affirmed.

E—THE COUNTERCLAIM:

█ Finally, the State, in its brief on appeal, requests this court to give consideration to permitting a counterclaim, sought to be interposed by the State for the first time in December, 1975, to be filed. Claimant, however, objects to such consideration pointing to the fact that the stipulated record on appeal contains no papers which preserve the State's right to argue the nonfinal order denying the State permission to file its counterclaim. The stipulated record on appeal includes none of the papers concerning the motion to file the counterclaim. Appeals must be decided on the content of the record. The submitted record must contain the papers on which the nonfinal order was based (*Austrian Lance & Stewart v Jackson,* 50 AD2d 735; *Saraceno v Piscopo,* 16 AD2d 735; *Bruno v Vernon Park Realty,* 2 AD2d 770, 771). Thus, the issue of the propriety of the denial of the State's counterclaim is not properly before this court for review.

The judgment should be affirmed, without costs.

SWEENEY, J. P., STALEY, JR., MAIN and LARKIN, JJ., concur.

Judgment affirmed, without costs.