OPINION OF THE COURT
Jules L. Spodek, J.
Plaintiff, Manshul Construction Corp. (Manshul), brings this suit against the Dormitory Authority of the State of New York (Dormitory Authority). The dispute arises out of the construction of the physical education building of Kingsborough Community College. The complaint contains three causes of action.
The first is an action essentially for “retainage” and contract balances in the amount of $441,009.90, which the defendant Dormitory Authority claims to have held on account to offset the value of claims asserted against the plaintiff Manshul. During trial, the defendant Dormitory Authority stipulated that it was holding the amount of $441,009.90 and that in computing any judgment said amount should properly be credited to the plaintiff Manshul.
The second cause of action is for compensation for “extras,” or for work done by the plaintiff, Manshul, not contemplated by the original agreement between the parties. Defendant Dormitory Authority maintains that what plaintiff considers extras were either called for in the original agreement or necessitated by plaintiff’s own failure to properly perform its obligations pursuant to the original agreement. Many items of extras were resolved by the parties before and during the course of this lengthy trial; some were credited to the plaintiff Manshul and others were withdrawn. Additionally, defendant Dormitory Authority’s counterclaims against plaintiff Manshul were also resolved by stipulation of the parties all resulting in a credit to the Dormitory Authority in the amount of $27,000.
The remaining items of the second cause of action, not resolved by the parties, were submitted to the jury by 20 *211 separate interrogatories each pertaining to a single remaining claim for an extra. The interrogatories did not contemplate overhead or profit.[1] A stipulation was entered into by the parties to the effect that overhead and profit would be added by the court.
Plaintiff’s third cause of action was for additional expenses for field and home office overhead, the increased costs of “labor inefficiency” and for the loss of anticipated revenues, each resulting from the defendant Dormitory
*212 Authority’s alleged breach of contract in improperly delaying the completion of plaintiff Manshul’s. contractual obligations and from what plaintiff claims was an unwarranted acceleration order.
The defendant Dormitory Authority claims that the acceleration order was necessitated by delays caused by the plaintiff and by plaintiff’s subcontractors and was required in order to complete the contract on time. Defendant further contends that delays in timely completion of the contract were the fault of plaintiff, particularly as it regards the purported failure of plaintiff Manshul to properly perform its early pile-driving operations and to complete a relatively small number of “punch list” items. Defendant further contends that even if plaintiff was entitled to recovery for these items, plaintiff did not suffer real and/or measurable damages in the amounts claimed. The items of claim from the third cause of action were posed to the jury in interrogatories No. 21 through No. 24.[2]
After allowing for the ministerial addition of amounts for overhead and profit pursuant to the stipulation of the parties, the verdict was as follows:
Plaintiff’s case:
First cause of action $ 441,009.90
Second cause of action 463,341.45
Third cause of action 1,687,477.00
$2,591,828.35
Less:
Defendant’s counterclaim 27,400.00
AMOUNT OF VERDICT $ 2,564,428.35[3]
Defendant Dormitory Authority moves to set aside the jury verdict as against the weight of the credible evidence. Defendant also seeks to set aside the verdict on the second cause of action as being the result of a jury compromise and seeks to set aside the jury award on interrogatories No. 21 through No. 24 as being legally insufficient and improper. *213 Plaintiff Manshul, of course, adamantly opposes each of defendant’s motions.
COMPROMISE VERDICT
The testimony adduced at trial was voluminous. Each side produced a parade of experts. Vast volumes of records and correspondence were entered into evidence. The trial itself stretched some nine weeks.
It is clear that the jury had a monumental task before it. Despite the highly technical nature of much of the evidence, the questions posed to the court from the deliberating jury evidenced an understanding of the issues involved and at no time did the jury suggest to the court that it was having difficulty reaching a verdict. Nor was there any pressure put upon the jury to return a verdict. It is therefore impossible to conclude that time pressures forced jurors to give up honestly and sincerely held convictions.
The law is clear that “[a] verdict that is the result of compromise and is not supported by the evidence cannot stand” (Tickner v Allen, 71 AD2d 835, 836; Parlato v Semmes Motors, 38 AD2d 844; 4 Weinstein-Korn-Miller, NY Civ Prac, par 4404.23). However, where the jury is presented with a range of testimony on damages it may believe that portion which it finds credible or worthy of belief. The fact that the verdict is in an amount equal to a percentage of the claim is not sufficient for proof of a compromise verdict under such circumstances. (Tickner v Allen, supra; also Camp v Camp 24 App Div 866.)
“[T]he test appears to be whether or not in the instant case there was surrender of conscientious convictions on one material issue by some jurors in return for a relinquishment of matters in their like settled opinion on another issue.” (Boudreau v Damas Food Mart Corp., 49 Misc 2d 913, 915, revd on other grounds 52 Misc 2d 930.) Practically restated, if “[b]y a tit-for-tat process jurors favoring no liability will yield to those favoring high damages by agreeing to liability with a reduced award,” or where liability is found but damages awarded are clearly inadequate, then an improper compromise verdict has resulted. (De Luca v Wells, 58 Misc 2d 878, 879; Geisel v Flushing Hosp. & Med. Center, 70 AD2d 927.)
*214 Where it appears “that the proof on the issues was inextricably interwoven or that error on some issues tainted findings on others,” then there must be a new trial on both liability and damages. (De Luca v Wells, supra, p 879.)
The mere fact that the dispute is sharp as to liability is not sufficient to show a compromise verdict. Nor is the inadequacy of the verdict alone sufficient to show an improper compromise.
“Inadequacy can come from niggardly 12 men as well as from compromising ones.” (De Luca v Wells, supra, p 879.)
However, when the dispute as to liability is sharp and the resulting verdict is clearly inadequate, and the findings are against the weight of the evidence, “it is only then that the stigma of compromise should be attached to [the jury’s] work.” (De Luca v Wells, supra, p 880.) This is only true, however, when “it is clear that under no rational process could the jury have arrived at the amount of damages they found” and the verdict they reached. (Klein v Eichen, 63 Misc 2d 590, 591.)
In this case, the dispute on most items was sharp. On some items, defendant conceded owing a portion of plaintiff’s claim, but contested only the amount.
Having argued throughout the trial that plaintiff Manshul’s claims were excessive, it is difficult for the defendant to now claim that the jury awards for these claims are inadequate; indeed, they do not do so. Clearly to find an improper compromise verdict, a finding of inadequacy as to damages is necessary.
There is sufficient evidence in the record to support the jury’s verdict on these items of claim. However, there is one exception regarding the jury award of $1,000 on interrogatory No. 14.
Interrogatory No. 14 regards plaintiff Manshul’s claim for $2,000 for using toilet partitions other than those specified in the contract. All testimony adduced on this issue supported a verdict of either $2,000 or a verdict for the defendant. There is no rational process by which the jury could have arrived at any amount of damages other than $2,000. Therefore, as to this issue alone, the jury *215 verdict as to liability and damages is set aside and a new trial may be had on this issue if either of the parties so desire.
At the conclusion of the jury’s deliberation, the jury returned to the clerk, together with exhibits, a piece of paper with several numbers on it. These items appeared to be six different percentages, added together and divided by six. The resulting percentage was then applied to one of plaintiff’s claims.
While defendant does not specifically raise the issue, in light of the above, some comment would appear necessary on the issue of “quotient verdicts.” A quotient verdict is “nothing more than a verdict by chance, is illegal, and must be set aside.” (Honigsberg v New York City Tr. Auth., 43 Misc 2d 1, 5, citing North Texas Producers Assn. v Jenkins, 342 SW2d 192 [Tex].) A quotient verdict may exist where jurors averaged their individual assessments and substituted the average for a consensus as to the verdict. However, for such to be deemed an improper quotient verdict more must be shown.
An element of a quotient verdict is that the jurors must agree beforehand to be bound by the quotient. (Honigsberg v New York City Tr. Auth., supra, citing Wilson v Gardner, 10 Utah 2d 89.) Further, the jurors must keep this agreement after the quotient is computed. The crucial test for a quotient verdict is that the jurors through an antecedent agreement, whether express or tacit, bind themselves to abide by the results of the quotient process, dispensing with collective discussion, deliberation and reasoning. But, even if they were bound initially, if they subsequently abandon their agreement to be bound, then the verdict will not be invalid. (Klein v Eichen, supra; Honigsberg v New York City Tr. Auth., supra.)
“The legal presumption is that no such arrangement was made.” (Honingsberg v New York City Tr. Auth., supra, p 6; Klein v Eichen, supra, p 593, citing State ex rel. Senter v Cowell, 125 Mo App 348; Farmer & Co. v Hooks, 239 F2d 547, cert den 353 US 911.) Further, where the jury reaches a decision as to liability first, and then proceeds to fix damages, the court is less likely to find a quotient verdict. *216 (Klein v Eichen, supra.) The existence of-a dissenting juror is indicative beyond peradventure of a lack of antecedent agreement, and surely reflects that there was not a consummated agreement to be bound by any quotient. (Klein v Eichen, supra.) On 5 of the 20 interrogatories, there were varying dissenting jurors on the issue of damages.
While it seems clear that a quotient process may have been utilized on one interrogatory, “to expect that each individual juror would [reach] an identical monetary evaluation * * * would be totally unrealistic.” (Klein v Eichen, supra, p 594.) In fact, the quotient process may have been useful in arriving at a true consensus as to damages to be awarded. There is no evidence that an improper quotient verdict was reached in this case and, therefore, defendant Dormitory Authority’s motion to set aside the jury verdict on interrogatories No. 1 through No. 20 (the second cause of action) is denied, except as to interrogatory No. 14, on which a new trial is ordered.
LABOR INEFFICIENCIES
Defendant Dormitory Authority moves that the jury verdict awarding $508,332 for labor inefficiencies caused by defendant’s breach of contract be set aside on the ground that plaintiff’s proof was insufficient as a matter of law. Plaintiff’s claim for this item is embodied in the third cause of action and was presented to the jury as interrogatory No. 21.
Defendant claims that plaintiff failed to prove that any labor inefficiency occurred. In support of this contention, defendant relies on tabulations presented by defendant’s counsel to the jury on summation. Defendant asserts that plaintiff Manshul had anticipated utilizing 45 workers for 40 weeks, resulting in a total of 1,800 “man weeks.” As a result of the acceleration ordered by the defendant, plaintiff Manshul actually employed 70 workers for 20 weeks for a total of 2,400 “man weeks.” Defendant concludes that no labor inefficiency was suffered by plaintiff Manshul.
It appears that the jury believed defense counsel’s calculations to be illusory. They were contradicted by plaintiff’s witnesses who testified as to what had been actually happening on the job site. In fact, cross-examination of the *217 defendant’s own witnesses adduced testimony regarding the inefficiencies created during the acceleration period. Plaintiff introduced his books, records and daily worklogs which showed an actual loss on this item. These facts were uncontroverted and ultimately belie defendant’s mathematical convolutions.
Defendant also claims that plaintiff employed an improper measure of damages to calculate cost of labor inefficiencies, to wit: actual cost less prebid estimates of cost.
Using prebid estimates to measure damages for labor inefficiency has been held impermissible (Mount Vernon Contr. Corp. v State of New York, 56 AD2d 952; Manshul Constr. Corp. v Dormitory Auth. of State of N. Y., 79 AD2d 383; Whitmyer Bros. v State of New York, 63 AD2d 103). Such procedure would involve the use of numbers of a subjective nature and could yield an unrealistic sum. (Mount Vernon Contr. Corp. v State of New York, supra, p 954.)
However, plaintiff Manshul did not ask the jury to rely on its prebid estimates. Plaintiff introduced testimony of experts in the construction field for the purpose of elucidating on plaintiff’s bid, showing what actual labor costs should have been on this job under the original contract at the Kingsborough site. Further, plaintiff Manshul relied on the testimony of the defendant Dormitory Authority’s own witnesses to establish what the actual cost of labor would have been had the job proceeded as contemplated by contract. Defendant’s witnesses, admittedly experts in various aspects of the construction field, testified as to defendant’s own estimate of actual labor costs as well.
Plaintiff introduced these estimates to show what portion of the contract price pertained to labor costs. With both plaintiff’s and defendant’s estimates of labor costs and the testimony of the experts on both sides, the jury could reasonably infer the amount of payments made under the contract by the Dormitory Authority which were allocable to labor costs. There is no more cogent evidence from which one can deduce which moneys paid were for labor costs. Payments to the plaintiff were made in lump sums and not *218 for specific work items. This approach also eliminates problems of mathematics created by defendant’s retainage of over $400,000 of the contract price. The plaintiff’s measure of damages, therefore, was:
(actual labor costs)
less (actual payment for _labor costs)_
(defendant’s responsibility for increased costs)
This is the appropriate measure of damages for labor inefficiency. (Mount Vernon Contr. Corp. v State of New York, supra; Whitmyer Bros. v State of New York, supra; Manshul Constr. Corp. v Dormitory Auth. of State of N. Y., supra.)
In addition, the objection raised by the Third Department in the Mount Vernon case (supra) is inapposite here. That court (p 954) objected to the use of prebid estimates in establishing losses for labor inefficiencies stating that this measure would take into account “other causes of delay not attributable to any act or omission on the part of the” defendant. This is not the case here where the jury clearly engaged in an apportionment of damages in accordance with responsibility. Defense counsel argues in its own reply brief referring specifically to the verdict for labor inefficiency damages, that “the jury appears to have found fault with both sides.” The court agrees with defense counsel’s assessment on this point.
In defense counsel’s reply brief defendant raises the issue that the jury verdict for labor inefficiency was “part and parcel” of a compromise verdict. This argument is belied by defendant’s own contention that the jury found fault with both sides. For this reason, as well as for the reasons outlined above, defendant’s motion to set aside the jury verdict for labor inefficiency is denied.
FIELD AND HOME OFFICE OVERHEAD
Defendant moves to set aside the jury verdict on interrogatories No. 22 and No. 23, which relate to extended field and home office overhead. Defendant’s objections to these awards are twofold: (a) first, that plaintiff’s proof of its *219 measure of damages is insufficient and improper as a matter of law and (b) second, that the verdicts are unsupported by the evidence.
The current state of the law in this area is uncertain and fluid. Prior to the Court of Appeals decision of November, 1978 in Berley Inds. v City of New York (45 NY2d 683) some courts had urged the Eichleay formula in determining extended home and field office overhead. (See Eichleay Corp. [60-2 Board of Contract Appeals Decisions, par 2688 (CCH)].) In Berley, Justice Fuchsberg, writing for a court unanimous only as to the result, but not as to the law,, cast some doubt on the viability of the Eichleay formula, requiring affirmative and tangible proof that such an increase in expenses had been suffered. A method for measuring such damages in the event that such proof was offered was left as an open question by the Berley court; in Berley, no such proof was found.
One week later, the Third Department issued its own means of determining extended overhead damages. (Fehlhaber Corp. v State of New York, 65 AD2d 119.) The Third Department allowed plaintiff to assess a reasonable percentage for extended overhead added to the amount allowed for additional work done after the contract completion date. The value of the extra work was determined on a quantum meruit basis. The overhead percentage allowed in Fehlhaber was 10.47% and this figure was derived from an analysis of plaintiff’s books and records. The Fehlhaber court, therefore, allowed plaintiff extended overhead by multiplying the percentage of overhead usually incurred by plaintiff by a quantum meruit evaluation of work done after the contract completion date.
Yet another formulaion of extended overhead damages was developed by the First Department, even as the case at bar was being heard by this jury. Interestingly enough, this case involved the same litigants as the present case. (Manshul Constr. Corp. v Dormitory Auth. of State of N. Y., supra.) The First Department urges a new and complex formula and dismisses the Eichleay formula as resulting (p 389) “in a wholly unrealistic figure.”
*220 This court finds none of these formulae satisfactory as applied to this case. Plaintiff Manshul has asked compensation for general overhead expenses incurred during a period of time after the contract completion date. Testimony was presented that plaintiff’s home office was so engrossed in the work problems resulting from the Kings-borough job, that no other work was being conducted by the home office. There was some evidence adduced from cross-examination that this was not absolutely the case, but in either regard, this was a question of fact for the jury.
Plaintiff Manshul also introduced volumes of correspondence (memoranda and log books) showing extensive amounts of work being done by the home office. Testimony was given as to the costs incurred in doing this work. This, too, became a question of fact for the jury.
It appears that the jury reached the following conclusions:
(1) that a substantial responsibility for the delay beyond the completion date was to be borne by the defendant Dormitory Authority
(2) that plaintiff Manshul had in fact expended a large sum for home office overhead after the contract completion date and
(3) that a significant percentage, if not all, of plaintiff’s home office work was related to the Kingsborough job.
The result is not unlike a formula:
(Total home office overhead for the extended period [as determined from proofs by the jury])
Less: (the amount of home office overhead allocated to jobs other than Kingsborough [as determined from the proofs by the jury])
Multiplied by: (the percentage of defendant Dormitory Authority’s liability [for delaying completion beyond the contract completion date]).
The jury awarded $316,455 out of plaintiff’s claim for $421,941, or approximately 75% of plaintiff Manshul’s claim. If one assumes that the jury believed plaintiff’s evidence that 100% of its home office overhead was focused on Kingsborough, and that the jury found Manshul’s home *221 office expenses for the extended period to be $421,941, then it becomes clear that the jury found the defendant Dormitory Authority responsible for 75% of the delays. Any range of findings on any of these three questions of fact, that resulted in the jury verdict of $316,455 would be permissible in light of the record.
There can be no justification for substituting a mathematical formula for the kind of direct evidence available to this jury in determining delay damages. The books, records and oral testimony of Manshul’s personnel is without doubt the best evidence of what actually happened in the home office. Mathematical formulae can lead to improbable results related only accidentally to the reality of damages. (See Berley Inds. v City of New York, supra.)
“Pragmatism * * * requires adjustment when the economic realities prevent placing the properties in neat logical valuation boxes.” (G.R.F. Inc. v Board of Assessors of County of Nassau, 41 NY2d 512, 515, as quoted in Manshul Constr. Corp. v Dormitory Auth. of State of N. Y., 78 AD2d 383, 389-390, supra.) Such is the situation in the case at bar.
Not accounted for in the analysis above is that portion of general overhead included in the contract and not earned by virtue of the fact that the contract had not terminated by the contract completion date. Plaintiff Manshul had completed 98% of its obligations at Kingsborough by the scheduled completion date. All that remained was a small number of “punch list” items.
Substantial performance of a contract will support a recovery of the contract price less allowances for any minor deficiencies in performance. (10 NY Jur, Contracts, § 324; Homecraft Alterations Corp. v Brill, 10 AD2d 732, affd 9 NY2d 978; Clothier v Kracko, 27 Misc 2d 920; Cordon Bleu, S.A. v BPC Pub., 451 F Supp 63; Dauchey v Drake, 85 NY 407; Porter v Traders’ Ins. Co. of Chicago, Ill., 164 NY 504.) There is substantial performance of a construction contract where all the essentials necessary to the full accomplishment of the purpose for which the building has been constructed are performed with such an approximation to complete performance that the owner obtains substantially *222 what is called for in the contract. (10 NY Jur, Contracts, § 328; Crouch v Gutmann, 134 NY 45; Spence v Ham, 163 NY 220.)
The record amply supports a jury finding that plaintiff Manshul had substantially performed. The true measure of recovery is the sum stipulated in the contract less the damages sustained by the failure strictly to perform. (10 NY Jur, Contracts, § 330; Jacob & Youngs v Kent, 230 NY 239.)
Though defendant Dormitory Authority had counterclaimed for certain items of nonperformance it has failed in its proofs to indicate any deficiencies in Manshul’s performance other than that for which it has been compensated by stipulation. Defendant agreed in its stipulation to certain credits for some of these items of nonperformance and a rule of logic dictates that the financial allowances for these deficiencies includes, partially, concomitant overhead. Therefore, to further deduct from plaintiff’s contractual allowance for general overhead would constitute double-billing on the defendant’s behalf. Defendant, at this stage, may not now make claim for items that it failed or neglected to prove at trial.
Plaintiff Manshul’s testimony as to field office overhead is in the same nature. Excluded, of course, is the second element — the amount of work being done at the field office after completion date relating to other jobs. No evidence was introduced to suggest that work was being done by plaintiff Manshul at the Kingsborough job site relating to any other job.
The jury awarded plaintiff $62,690 on its claim of $83,587, again approximately 75% of the claim. Given the evidence presented in this case, this finding is also permissible. Here,, the jury apparently believed plaintiff’s evidence as to the cost of overhead for a field office after the contract completion date, and again assessed approximately 75% responsibility for the delay to the defendant Dormitory Authority. The evidence in the record is ample to support such a finding.
The overhead awarded here is not to be confused with the overhead awarded on those items of extras completed *223 after the contract completion date. This is “general extended” overhead, and not “specific” overhead or overhead related exclusively to the performance of the specific item of extra. Therefore, defendant’s assertion that these claims represent double-billing is unfounded.
For these reasons, this court finds that plaintiff Manshul’s claims for extended home and field office overhead are legally sufficient and that the jury’s award on these items was not contrary to the weight of the evidence. Accordingly, defendant Dormitory Authority’s motion to set aside the jury verdict on interrogatories No. 22 and No. 23 is denied.
LOSS OF ANTICIPATED REVENUES (PROFITS)
Defendant moves to set aside the jury verdict on interrogatory No. 24 awarding plaintiff, Manshul, $800,000 in damages for loss of anticipated revenues (profits). This renews defendant’s motion during trial to dismiss plaintiff’s claim for this item, upon which this court reserved decision. Of practical and procedural necessity, this issue was presented to the jury. The court now grants defendant Dormitory Authority’s motion to set aside this item.
Plaintiff Manshul contends that lost profits are a direct consequential result of defendant Dormitory Authority’s breach of contract and that these are damages which “flow naturally” from the contractual breach. Plaintiff Manshul asserts that because defendant Dormitory Authority had special knowledge of the results the hardship would cause to plaintiff by its (defendant’s) delays, plaintiff Manshul was entitled to this measure of damages.
Defendant Dormitory Authority contends that these damages are so highly speculative as to make them impermissible as a matter of law. Further, defendant claims that plaintiff Manshul is not entitled to this item due to its failure to take steps to mitigate these damages.
A survey of recent construction cases indicates that this is a question of first impression as it relates to construction contracts. In Whitmyer Bros. v State of New York (63 AD2d 103, 108, supra), the Third Department “agree[d] with the trial court that Whitmyer was entitled to damages for loss *224 of profits, not only its own profits, but also, [for loss of profits for its subcontractor] Lambert”.
However, the loss of profits at issue in Whitmyer (supra) were profits relating to the very contract itself and dealt with the question of whether plaintiff had been fully compensated for work done pursuant to that contract. In the case at bar, plaintiff Manshul seeks damages for unearned profits from subsequent jobs, jobs which plaintiff contends it could not bid on and contract due to the wrongful delay of the defendant Dormitory Authority.
In Berley Inds. v City of New York (45 NY2d 683, supra), the Court of Appeals was called upon to decide the proper measure of delay damages. However, there, plaintiff made no claim for loss of profits. As a result, the court considered delay damages only in terms of increased overhead. Similarly, in Fehlhaber Corp. v State of New York (65 AD2d 119, supra) the Third Department was not asked to rule on the question of damages for lost profits. In the recent First Department case (Manshul Constr. Corp. v Dormitory Auth. of State of N. Y., 79 AD2d 383, supra) lost profits were awarded only on items of extra. The theory proffered by plaintiff here was not urged upon the court in Manshul I.
Plaintiff Manshul would be quick to agree that the present case differs from these others. In this case, plaintiff offered proof of its inability to estimate on future jobs and of the amount of profits prospectively lost as a result thereof.
“A person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain.” (Wakeman v Wheeler & Wilson Mfg. Co., 101 NY 205, 209.) However, defendant’s characterization of plaintiff Manshul’s lost profits claim as “inference being piled upon inference” is well taken, in spite of the fact that many of these inferences were reasonable.
For example, plaintiff Manshul urges that had the Kingsborough job gone smoothly it would have realized profits: (1) if there were other jobs; (2) if it had estimated other jobs; (3) if it had bid on other jobs and (4) if the job *225 had been awarded by the owner. The basic inferences are reasonable and plaintiff Manshul introduced some proof that there were some other jobs.
The remaining inferences — (5) if the plaintiff had been low bidder; (6) if the jobs had proceeded; (7) if plaintiff had no problems; (8) if plaintiff had been paid and (9) if the jobs had been big and successful enough to generate $1,800,000 in profits — are subject to lesser though varying degrees of reason.
The latter inferences are of a substantially more speculative nature. “[Djamages must be not merely speculative, possible and imaginary, but they must be reasonably certain, and such only as actually follow or may follow from the breach of the contract. They may be so remote as not to be directly traceable to the breach, or they may be the result of other intervening causes, and then they cannot be allowed.” (Wakeman v Wheeler & Wilson Mfg. Co., supra, at p 209.)
Plaintiff Manshul introduced testimony to the effect that there were at least a few jobs available for bidding. They showed their previous success rate in bidding. They showed their previous profit rate.
Left open and subject to question, however, were the following: During the period following 1975, in the New York City metropolitan area were there comparable jobs, both as to size and amount, available during the extended period as during previous years? Had the economic and market conditions changed? Would Manshul have actually succeeded in being successful low bidder in any of its bids under changed economic and market conditions? Could there be any assurance that any future job taken on by Manshul would go smoothly, and that Manshul would earn a significant profit on that job? Would there have been enough of these jobs, generating enough of a profit to have earned plaintiff Manshul the $1,800,000 plaintiff claimed? Or even the $800,000 "that the jury awarded?
The intervening factors, the open-ended possibilities and the wishful nature of the inferences leads this court to the inevitable conclusion that plaintiff Manshul’s claim for damages for loss of anticipated revenues is too speculative to stand as a matter of law.
*226 It should be noted, however, that the damages plaintiff Manshul seeks to recover may have been recoverable had plaintiff sued for prima facie tort. The behavior of the Dormitory Authority and its agents, servants and employees throughout the course of this job should be the subject of severe and serious criticism. It is unfortunate, however, that this type of damages is unavailable to plaintiff to serve, if you will, as Manshul’s “pain and suffering”.
While it is true that this court granted a motion to conform the pleadings to the proof, it is clear that this did not create a cause of action in tort or in prima facie tort. No interpretation of plaintiff’s pleadings could have allowed such. “ ‘Liberality in pleading’ is stretched too far when it is deemed permissible to plead one claim and then substitute for it an entirely different one.” (New York Auction Co. Div. of Std. Prudential Corp. v Belt, 53 AD2d 540, cited by Andres v Perry, 81 AD2d 848.)
There remains still another reason for granting defendant’s motion to set aside this award. Defendant’s argument that plaintiff Manshul could have taken steps to mitigate this damage is well taken. No citation is required for the proposition that an injured party must take reasonable steps to mitigate damages arising out of a breach of contract. This principle is clearly applicable in construction cases. (Bero Constr. Corp. v State of New York, 27 AD2d 974.)
The thrust of plaintiff Manshul’s claim here is that the home office was so tied up on the Kingsborough job that it was unable to estimate and bid on other jobs. However, Manshul could easily have hired an estimator to handle bidding procedures. Manshul would then be entitled only to damages for the cost of this employee. No proof was offered as to what that cost would have been.
For the reasons set forth above, the entire verdict in the sum of $800,000 for loss of anticipated revenues is set aside.
Defendant’s motion to set aside the jury verdict is denied except as to interrogatory No. 14, on which the jury verdict is vacated and a new trial is ordered and as to inter *227 rogatory No. 24, upon which defendant’s motion to set aside the jury verdict for $800,000 is granted.

. The jury’s verdict as to the interrogatories was as follows:
INTERRO GATORY NUMBER
ITEM
MAXIMUM OF PLAINT. CLAIM
(Y/N)a(AMOUNT)b
BREACH/ CONTEMP. OF CONTRACTc
DISSENTd
1 Temporary roadway $ 10,490 Y $ 9,122 B a,b,c
2 Pile driving 121,000 Y 60,500 B a,b,c
3 Pile redesign 53,404 Y 26,702 B none
4 Colorchron floors 8,790.88 Y 8,790.88 B none
5 Masonry 166,000 Y 55,370 B b
6 Painting 30,225 Y 18,000 B none
7 WITHDRAWN
8 Steel bents 31,853.53 Y 19,110 B none
9 Pool loc’t’n. 35,000 Y 20,000 B a,b,c
10 Vapor barrier 8,903.95 Y 8,903.95 B a,b,c
11 Pool leaks 19,191 Y 9,000 B none
12 Fisher skylight 30,000 N a
13 Flooring 27,413.93 Y 16,445 B none
14 Toilet part’ns. 2,000 Y 1,000 C none
15 Composite deck 20,000 Y 15,000 B none
16 Cleaning 21,496.68 Y 10,000 B none
17 Patch wk. 15,117.80 Y 9,000 B none
18 Water 2,476.74 Y 1,800 B none
19 Debris 5,275 Y 2,637 B none
20 Phase II demolition 32,422.34 Y 19,332 B none
a — Interrogatory question (a) reads as follows: “is the plaintiff entitled to recover for this item of work as an extra to the contract (Yes ‘Y’ or No ‘N’)?”
b — Interrogatory question (b) reads as follows: “if your answer to ‘a’ is yes: What amount is plaintiff entitled to recover for this item of work, not taking into consideration overhead and/or profit, or contractual provisions for the same?”
c — Interrogatory question (c) reads as follows: “If your answer to ‘a’ is yes: Was this an item of work performed as an extra within the contemplation of the contract or was this an item of work done as an extra as a result of the defendant’s breach of contract? (contemplated by contract ‘c’ or resulting from breach ‘B’)?”
d •— Letters refer to questions on which there was a dissenting juror a, b or c.

.
NO. ITEM MAXIMUM Y/N AMOUNT DISSENT
21 Labor inefficiency $ 671,309.66 Y $ 508,332 amount only
22 Field office ovhd. 83,587 Y 62,690 none
23 Central off. ovhd. 421,941 Y 316,455 amount only
24 Anticipated revenues 1,800,000 Y 800,000 liab. & amount

. By stipulation of the parties, interest on the above would run from October 5, 1975.