**STELLAR
MANUFACTURING COMPANY**

v.

**TENNESSEE VALLEY AUTHORITY.**

Civ. A. No. 87–7109.

United States District Court,
E.D. Pennsylvania.

March 3, 1989.

I. Michael Heine, Haddonfield, N.J., Robert A. Swift, Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., for plaintiff.

James E. Fox, Deputy Gen. Counsel, Edwin W. Small, Asst. Gen. Counsel, Peter K. Shea, Richard E. Riggs, Office of General Counsel, Tennessee Valley Authority, Knoxville, Tenn., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KATZ, District Judge.

## FINDINGS OF FACT

### A. *Introduction*

1. Tennessee Valley Authority ("TVA") is an agency and instrumentality of the United States. Stellar Manufacturing Company ("Stellar") is a closely held business, owned 76 percent by Peter M. Sarraiocco and 24 percent by Samuel R. Caiazzo. On April 23, 1976, TVA awarded Contract No. 76K70–820118 to Stellar, in the original base amount of $2,844,000. Change orders totalling $2,211,038 increased the contract price 78 percent to $5,055,038. Further adjustments, backcharges, and escalations brought the actual disbursements to $6,486,871.04.

2. Plaintiff's contract required it to fabricate under close tolerances, and ship to TVA, stainless steel fuel pool liner panels with structural steel supports for six nuclear power plants. The plants were known by designations X17 through X22. The panels were to be assembled and erected in the field by TVA. Four of those plants were located at Hartsville, Tennessee and two at Phipps–Bend, Tennessee. The original contract completion date was March 1, 1979, for delivery of the last of the fuel pool liners for the six power plants.

3. Plaintiff's panels and fabrications, when erected at the site, would create four rectangular pools at each of the six nuclear plants, for a total of 24 pools. Each pool was approximately 43' high, and the pools varied in length and width, the largest being approximately 29' × 33'. Further, each pool required the fabrication by Stellar of numerous large stainless steel panels, with rear supports, which varied in length and width, the largest being approximately 8' × 22'. Each panel required several hundred feet of continuous/intermittent welds.

4. In addition to these units and quantities, Stellar was required to fabricate the gate frames which linked these fuel pools and were part of the mechanism which controlled the flow of liquids between the tanks. Three massive gate frames were required for each of the six nuclear units. Their dimensions were approximately as follows:

1. 15½' h × 12½' w × 3½' d
2. 27' h × 7' w × 4' d
3. 27' h × 6' w × 2' d

Each gate frame was fabricated with ¼" thick stainless steel and weighed, assembled by plaintiff, several tons. The fabrication required hundreds of feet of continuous welding.

5. General Electric Company ("GE") served as the technical engineer for the contract (*i.e.*, GE was responsible for developing the technical specifications and drawings). GE, in turn, contracted with C.F. Braun & Co. ("Braun") to perform technical reviews and develop specifications. The nuclear units were to be designed and built in accordance with GE's standard reactor island design (STRIDE) program which was developed by GE to standardize the construction of nuclear plants.

6. As originally agreed, Stellar was to complete its work and deliver the pool liners according to the following schedule:

**784**

X17 February 1, 1977
X18 December 1, 1977
X19 June 1, 1977
X20 June 1, 1978
X21 March 1, 1978
X22 March 1, 1979

These dates were extended by subsequent change orders. Ultimately, the completion date for X22 was extended by TVA to March 13, 1980.

7. There were a total of 14 change orders to the contract. Of these change orders, some dealt with clarifications and resequencing of performance dates (Nos. 5, 6, 7, 9, 11); some dealt with the designation of the TVA purchasing agent (Nos. 8, 14) and with the allocation of work for the purpose of calculating progress payments (No. 3). Change orders Nos. 4 and 10 granted contract extensions. Change order No. 12 added the purchase and delivery of stainless steel plates to the contract. Change order No. 13 provided TVA a credit for deletion of work associated with the liquid dye penetrant examination of welds. The remaining two change orders (Nos. 1, 2) increased the contract price and extended the performance date for each unit.

8. In the summer of 1976, approximately four months after the contract was awarded, TVA issued Revision No. 1 to the contract drawings which involved design changes in the work being done by Stellar. On October 13, 1976, Stellar informed TVA of the total cost and time impact of all changes and delays to date. This submittal was subsequently amended by Stellar on November 30 and December 7, to alter the terms of payment.

9. Change order No. 1 to the contract was issued on February 24, 1977. Under change order No. 1, Stellar received an additional net sum of $1,784,877, the full amount of increased compensation Stellar had requested for all changes and delays to date, including those associated with Revision No. 1 to the contract drawings. In addition, as requested by Stellar, change order No. 1 revised the payment terms of the contract to provide for progress payments based upon percentages of work completed rather than upon actual deliveries to TVA. Also, as requested by Stellar,

change order No. 1 granted a 184–day extension for completion of work on the contract.

10. In May, 1977, TVA issued Revision No. 2 to the contract drawings, which also involved design changes to the work being done by Stellar. After a series of meetings among TVA, GE, Braun, and Stellar to discuss Revision No. 2 and other design matters, Stellar submitted, on July 29, 1977, its written proposal for cost and time adjustments to compensate Stellar for all changes and delays to date. Stellar amended its proposal on October 1 and November 21.

11. Change order No. 2 to the contract was issued November 28, 1977. Under change order No. 2, Stellar received an additional $449,557. The work completion dates were also adjusted to add contract extensions for each unit as requested in Stellar's written proposal of July 29, 1977.

12. The annual totals of Stellar's invoices to TVA, based upon Stellar's percentage of work completed under the contract, were as follows:

| | |
|---|---|
| 1977 | $1,150,481.14 |
| 1978 | $ 786,526.98 |
| 1979 | $2,815,661.84 |
| 1980 | $2,184,803.09 |
| 1981 | $ 122,118.83 |
| 1982 | $ 78,267.08 |

13. Stellar completely performed its work under the contract on or about April 2, 1982, with its last shipment on that date.

14. On March 31, 1977, TVA awarded Contract No. 77K71–820116 to Stellar in the amount of $996,372. The contract, which was subject to various labor and materials escalation adjustments, called for the fabrication and delivery to TVA of stainless steel weirwall liners for units X17 through X22. Work under the contract was scheduled to be completed as follows:

X17 June 1, 1977
X18 April 1, 1978
X19 December 1, 1977
X20 December 1, 1978
X21 July 1, 1978
X22 March 1, 1979

15. There were 11 changes to the contract, and the contract was completed ahead of schedule. The final contract price

was $1,011,939.22; and, after adjustments for backcharges and labor and materials escalations, TVA ultimately paid Stellar a total of $1,055,633.69 for work on the contract, $956,279.54 of which Stellar invoiced to TVA in 1978.

16. On October 10, 1983, Stellar submitted a series of claims to TVA, which were ultimately certified as required by the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613, on June 13, 1984. As certified, Stellar claims relating to Contract No. 76K70–820118, the fuel pool liner contract, involved eight separate areas: general delays through May 15, 1978, lack of information relating to tolerance criteria, lack of information relating to field erection procedures, liquid dye penetrant examination, backcharges for scupper and liner panel repair, purchase of stainless steel plate, gate frames redesign, and contract retainage. Stellar asserted it was due a total of $2,679,003 in connection with these claims, together with a contract extension of 1,177 days which would have entitled Stellar to a further unspecified amount due to labor and material escalation adjustments. With regard to Contract No. 77K71–820116, Stellar claimed that it was unjustly backcharged $10,187.57 for repairs to weirwall liners. The claims asserted in Stellar's complaint generally mirror the claims asserted in the administrative context. On December 18, 1984, Stellar sent TVA supplemental information in support of Stellar's claims.

17. As part of the claims process, TVA submitted a claim of its own to the Contracting Officer. TVA's claim was for $19,800.18 in connection with repairs TVA made to defective work performed by Stellar on weirwall liner panels. TVA's counterclaim in this action mirrors the claim it submitted earlier to the Contracting Officer.

18. On March 14, 1985, TVA's Contracting Officer issued a decision denying Stellar's claims and granting TVA's counterclaim.

19. On March 13, 1986, Stellar filed suit against TVA in the United States District Court for the District of New Jersey.

20. In the Joint Proposed Final Pretrial Order ("Final Pretrial Order") submitted by the parties, and at the trial, Stellar reduced to three the number of its claims against TVA. The first claim asserted is for 90 compensable delay days, alleged by Stellar to have resulted from a 90–day hold (January 1, 1979 to April 1, 1979) imposed by Stellar on material purchases from one of its subcontractors, and necessitated by design changes embodied in Revision No. 3 to the contract. Stellar's second claim is for compensation for extended overhead costs associated with a 60–day delay resulting from certain field erection coordination problems, for which Stellar was granted a contract extension of 60 days in Change Order No. 10, issued August 8, 1979. Stellar's final and major claim is for 686 days of compensable delay allegedly attributable to problems associated with the design and fabrication of gate frames. These claims roughly correspond to Stellar's original claims No. 1, No. 3, and No. 7, respectively.

21. In the Final Pretrial Order and at trial, TVA continued to assert its counterclaim on the weirwall liner contract.

## B. Stellar's Claims under Contract No. 76K70–820118

### The 90–day Claim

22. Stellar claims that it should be awarded 90 compensable delay days on the contract for delays experienced as a result of a 90–day hold, running from January 1 to April 1, 1978, it claims it put on a delivery contract with one of its subcontractors, G.O. Carlson. Stellar maintains that it was required to institute the 90–day hold because of design changes embodied in Revision No. 3 to Stellar's contract with TVA, and that the purpose of the hold was to facilitate an internal review of the possible ramifications of the design changes on the subject matter of the Carlson contract.

23. Revision No. 3 was issued on December 13, 1977. Some of the changes to the contract design reflected in Revision No. 3 had been suggested to Stellar as early as May and June, 1977. I credit Roberts' testimony on this point.

24. Carlson was a supplier of stainless steel plate to Stellar. On August 31, 1977, Stellar placed an order with Carlson for a substantial quantity of 304–L stainless steel plate. Plaintiff's Exhibit ("Pl.Exh.") P–196. Carlson made shipments to Stellar on November 9, 1977, December 7, 1977, March 10, 1978, April 21, 1978, May 31, 1978, and June 23, 1978. Pl.Exhs. P–197, P–198, P–199, P–200, P–201, P–202 and P–203. The March 10 delivery occurred during the purported hold period.

25. Stellar has produced no persuasive documentary evidence indicating that a hold on the Carlson contract was ever instituted. To the contrary, what scant documentary evidence has been introduced on the issue does not refer to the claimed hold and is inconsistent with the notion of the claimed hold. I do not credit plaintiff's officers' testimony that they placed a hold on Carlson during the period at issue. Nor is Kolinger's vague testimony persuasive on this point. In any event, Revision No. 3 had no impact on Stellar, Stellar knew the nature of the revision before it was formally issued and Stellar's placing the hold on its subcontractor, Carlson, would have been unnecessary. TVA had no knowledge of the hold at issue.

26. On January 16, 1978 and February 21, 1978, during the purported hold period, Stellar personnel visited the G.O. Carlson facility for the purpose of inspecting stainless steel plates; Stellar's internal reports of these visits make no mention of any hold on the contract. Internal notes of a March 10, 1978 meeting among Stellar employees report that among the matters discussed was the fact that "inner jamb materials [were] required from Carlson by 3/15/78." No mention was made in these internal notes of any hold on the Carlson contract. Defendant's Exhibit ("Def.Exh.") DX–8.

27. Lack of documentary evidence pertaining to the purported 90–day hold is not explained by the notion that it was not Stellar's business practice to memorialize such events. Documentary evidence does exist demonstrating that on February 9, 1978, Stellar did institute a hold on certain G.O. Carlson deliveries, and that on February 20, 1978, this hold was lifted. *Id.* Stellar does not claim delay damages against TVA as a result of this hold. The claimed 90–day hold was not necessary to evaluate Revision No. 3; it was much too long for that purpose. I do not credit the testimony that 90 days was needed to evaluate Revision No. 3.

28. During the three-month period for which Stellar claims a delay due to the purported hold on its deliveries from Carlson, Stellar experienced concurrent delays due to factors for which Stellar was responsible, including delays attributable to the setup of supplementary panel mating, Def.Exhs. DX–158, at 7097322 and DX–69, and delays attributable to problems Stellar was having with another of its subcontractors, Tura Machine Corporation. Def. Exhs. DX–131 and DX–97.

29. On January 9, 1978, TVA placed a quality assurance hold on further assembly, welding, and shipment on the contract, based on TVA's position that Stellar had not complied with certain of the contract's quality assurance specifications. The hold was lifted on February 8, 1979, following Stellar's correction of the deficiencies noted. Def.Exhs. DX–245 and DX–187.

30. Stellar's claim was not raised with TVA within 30 days of the event giving rise to it.

The 60–day Claim

31. Stellar claims it is due compensation for extended overhead associated with 60 days of delay allegedly resulting from lack of field erection coordination. Stellar no longer seeks compensation for the $24,536 production costs alleged at earlier stages of the case.

32. The contract extension granted Stellar in Change order No. 10 was for delays associated with field erection coordination problems experienced by Stellar in 1976. This was the conclusion arrived at by Stellar's expert, Theodore Trauner, after an extensive analysis of all the documents, including the background documents to Change order No. 10 in their complete form. I credit Trauner's placing the 60–day period in 1976 over the testimony of plaintiff's officers because Trauner made a

more careful study of the documentation and had less reasons to exaggerate placement of the claim in the post-July 29, 1977 period. Kolinger's testimony on this issue was too vague to be credited.

33. In the Final Pretrial Order, Stellar admits "seek[ing] no relief in this action for known events occurring prior to July 29, 1977." Final Pretrial Order at 9 n. 3. At page 19 of the Final Pretrial Order, Stellar asserts that it "makes no claim in the instant case as to facts arising prior to July, 1977."

34. Change Order Nos. 1 and 2 fully compensated Stellar for all delays and impacts associated with all changes and delays through July 29, 1977. These two change orders were issued on the basis of cost proposals submitted by Stellar and on the basis of negotiations between the parties. On page 9 of the Final Pretrial Order, Stellar admits that "[b]y bilateral agreement effective as to events occurring on and to July 29, 1977, the parties adjusted the contract price allowing for all delays occurring as of that date...."

35. In Stellar's certified claim to the Contracting Officer, Stellar asserted it had encountered 153 days of delay, encompassing the period from May, 1978 to September, 1978, due to lack of field erection coordination. From this 153 day period, Stellar then subtracted 60 days, which it maintained had already been "allowed" by change order No. 10. Def.Exh. DX–3 at 022390. Stellar thus certified a net time delay for alleged lack of field erection coordination of 93 days. It did not certify its 60 day claim to the Contracted Officer; on the contrary, it explicitly excepted the 60 day period from its certified claim.

36. On June 2, 1977, Braun sent Stellar a copy of TVA drawing No. JW–2–2–77, which illustrated field weld details for the fuel pool liner plates and fuel transfer tube. Def.Exh. DX–31. On June 1, TVA furnished Stellar with minutes of a May 19–20 meeting setting out the field erection sequence for the four fuel storage pools. Def.Exh. DX–30. I credit Roberts' testimony that TVA furnished the necessary weld details and sequencing of erection informa-

tion to plaintiff in 1977. I do not credit the testimony of plaintiff's officers or Kolinger on this point.

37. On May 10, 1979, Stellar, TVA, GE and Braun met in Alhambra, California, to discuss Stellar's various requests for contract extensions. The field erection information allegations were among those issues discussed at the meeting. TVA agreed to permit Stellar a contract extension of 60 days for each unit, which was incorporated in change order No. 10, issued on August 8, 1979.

38. Stellar's claim was not raised with TVA within 30 days of the event giving rise to it.

The Gate Frame Claim

39. Stellar claims compensation for 686 days of delay allegedly encountered as a result of the non-fabricability of fuel pool gate frames as designed in the contract drawings. Stellar divides this aggregate delay into a delay period of 316 days (August 21, 1978 to July 2, 1979) associated with design clarification problems, and a delay period of 370 days (July 2, 1979 to July 6, 1980) due to increased fabrication burdens arising out of the redesign of the gate frames.

40. In Stellar's certified claim to the TVA Contracting Officer, Stellar claimed 364 delay days in connection with purported gate frame design changes. Stellar divided this aggregate delay as follows: (a) 150 days in 1978 for Stellar's unsuccessful attempt to fabricate a gate frame in accordance with contract specifications, (b) 30 days of delay in 1978 and 90 days of delay in 1979 due to design clarification discussions, and (c) 94 days during the period 1979–1981 for added fabrication burdens. Def.Exh. DX–3 at 022426.

41. At a meeting on August 14, 1978 attended by Stellar and TVA officials, Stellar indicated that it would pursue fabrication of the gate frames to comply with the contract design, but that if these efforts proved to be impractical, it would insist on a design change. Pl.Exh. P–50 at 101168.

42. Later in August, Stellar formally notified TVA of its position that the gate frames were not fabricable as designed.

43. Following negotiations between Stellar, TVA, GE and Braun, in mid-January, 1979, Stellar and TVA reached an agreement whereby TVA agreed to accept gate frame design changes proposed by Stellar on the condition that no added cost or schedule impact would result from this acceptance.

44. On January 22, 1979 Stellar wrote to General Electric confirming that the gate frames, under the new design change, would be manufactured at no extra cost to TVA and that there would be no schedule impact. Def.Exh. DX–88. Caiazzo's handwritten notes of a conference call occurring that day between himself and representatives of GE, Braun, and TVA state that "[w]e are to write letter. No price and schedule change." Def.Exh. DX–151.

45. On March 20, 1979, Stellar wrote to TVA confirming again that there would be no additional material and labor cost charged for the design changes, but asserting for the first time that a schedule impact would result. Pl.Exh. P–73.

46. On April 6, 1979, TVA wrote Stellar that no schedule extensions would be granted on the ground that TVA had agreed to Stellar's redesign only on the condition that no adverse effect on the schedule would result. The letter also noted that TVA had been informed by the technical engineer that the gate frames could have been fabricated according to their original design. Def.Exh. DX–156.

47. At the May 10, 1979 meeting in Alhambra, California among Stellar, TVA, GE and Braun, Stellar agreed to absorb all additional costs, but requested a time extension of 90 days for each unit. TVA rejected the requests on the basis of the prior agreement. Def.Exh. DX–160 and Pl.Exh. P–206.

48. Stellar fabricated the gate frames in accordance with Stellar's design changes which had been accepted by TVA in January, 1979.

49. Whether the gate frames were fabricable as designed is a close question. Mr. Reedy's testimony that the gate frames were fabricable as designed is persuasive. On the other hand, plaintiff did have difficulty with the design and made revisions to the fabricating details. I find that Stellar has not met its burden of proof on this difficult question.

50. Stellar represented that its revisions would have no adverse effect on costs or schedule. TVA reasonably relied on those representations and agreed to accept Stellar's revisions on the condition that those representations were part of the understanding. TVA suffered the detriment of foregoing other alternatives, such as seeking another contractor, bringing the work in-house, or claiming against the designer. I cannot credit Stellar's claim that "cost" meant labor and materials, not overhead, or its claim that it did not agree that the contract completion schedule would be unaffected by its revisions. No documentation supports plaintiff's belated interpretation of the cost and scheduling terms of its arrangement with TVA about the revisions.

51. Nor can I credit Mr. Kolinger's claim that TVA recognized a $1 million obligation to Stellar. His testimony was too vague to be persuasive as an admission that TVA owed Stellar $1 million. There was, according to him, very little discussion of this matter as to which the participants in the meeting "seemed" to be in agreement. Not a single document supports Kolinger's claim; the only notes of the meeting do not support Kolinger's version. Def.Exh. DX–160 and Pl.Exh. P–206. Kolinger did make false statements on other matters in various applications about his education and status as an engineer. He was removed from a position with TVA before his voluntary retirement.

52. Stellar did not assert any of its gate frame claims with TVA within 30 days of the events giving rise to their occurrence.

C. *TVA's Counterclaim on Contract No. 77K71–820116*

53. In March, 1981, TVA informed Stellar that further repairs on the weirwall

liners would be necessary. Def.Exh. DX–233. These repairs were required because the panels did not meet the dimensional tolerances required by contract specifications. Basically, Stellar created an unacceptable alignment which required reworking of the weld joints, adjustments to the liners, and the placing of shims to bolt the liners together. Simply stated, Stellar furnished defective materials which TVA had to repair. Stellar's claims that the panels were mis-assembled by TVA or left out in the field to their detriment are unpersuasive. I credit Mr. Rose's testimony.

54. By letter dated April 28, 1981, TVA notified Stellar that a backcharge account was being set up to repair the defects. Def.Exh. DX–234. Stellar did not repair the weirwall liners.

55. TVA's correction of the defects necessitated 815 man hours (boilermaker classification), as well as the necessary material and equipment to correct the unacceptable alignment of the liners. The total actual cost to TVA was $19,800.18. Def. Exhs. DX–235 and DX–231.

56. On May 9, 1983, TVA informed Stellar that, during the closeout of TVA's accounts on the contract, TVA had inadvertently failed to retain the $19,800.18 backcharge TVA had incurred while correcting the defects in liner alignment. Def.Exh. DX–235.

57. TVA's repairs were made necessary by defects in weirwall fabrication for which Stellar was responsible. TVA's actual repair cost was reasonable.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this action pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613.

2. The Special Conditions part ("Claims and Protests by Contractor") of both of TVA's contracts with Stellar requires that all claims by Stellar must be filed with TVA's Contracting Officer within 30 calendar days "after the arising of the cause for any such claim." Stellar's failure to raise any of its claims timely as required by the contract constitutes a full and complete waiver of each claim.

3. The General Conditions part ("Notices") of TVA's contracts with Stellar provide that TVA's consideration of a claim does not waive the filing requirement. TVA's consideration and review of Stellar's untimely submitted claims does not serve as a waiver of the 30–day filing requirement.

4. The Contract Disputes Act requires that contractors making claims of more than $50,000 shall certify these claims to the Contracting Officer.

5. This court lacks jurisdiction over Stellar's 60–day claim. This conclusion is in accordance with my factual finding that Stellar did not certify that claim to the Contracting Officer.

6. Change Orders No. 1 & 2 constitute an accord and satisfaction between Stellar and TVA barring future claims by Stellar for compensation due to any delays resulting from events occurring prior to at least July 29, 1977. Stellar's 60–day claim is thus barred.

7. Stellar's gate frame claim is barred by an accord and satisfaction reached by the parties in January, 1979.

8. Stellar's gate frame claim is barred by the doctrine of promissory estoppel.

## JUDGMENT

AND NOW, this 2nd day of March, 1989, after a trial on the merits, judgment is hereby entered in favor of defendant and against plaintiff on plaintiff's complaint and in favor of defendant and against plaintiff in the sum of $19,800.18 on defendant's counterclaim.