**PORT CHESTER ELECTRICAL CONSTRUCTION CORP.,**
**Plaintiff,**

v.

**HBE CORPORATION and the Fireman's Fund Insurance Company, Defendants.**

**No. 86 Civ. 4617 (KMW).**

United States District Court, S.D. New York.

Oct. 2, 1991.

Lawrence Leykam and Ira Schulman of Ross & Cohen, New York City, for plaintiff.

Richard Sher and Jeffrey Kalinowski of Peper, Martin, Jensen, Maichel and Hetlage, St. Louis, Mo., for defendants.

## OPINION AND ORDER

NINA GERSHON, United States Magistrate Judge:

This is an action by an electrical subcontractor against a general contractor and its surety for delay damages following completion of a contract for renovations and new construction on the Nyack Hospital in Nyack, New York. Pursuant to the parties' consent under 28 U.S.C. § 636(c), a bench trial was held before me. This Opinion and Order contains the findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure.

*The Delays and Their Effect on Port Chester*

As a "design/build" contractor, defendant HBE Corporation ("HBE") was responsible for the architectural design of the work and served as general contractor. Defendant The Fireman's Fund Insurance Company was HBE's surety on the Project. The "Phase II" work (the "Project") called for in HBE's contract with the Hospital consisted of both new construction and the renovation of an existing multi-floor building.

Port Chester Electrical Construction Corp. ("Port Chester") and HBE entered into a subcontract in the amount of $1,222,-000 for the electrical work on the Project in October 1982. Although the expected completion date for the Project was December 31, 1983, the Project, including Port Chester's final work, was not in fact completed until June of 1986.

The principal cause of the delay was that the original contract work was changed significantly, both by the addition of new work and by the alteration of the original plans. These changes created "extra work" for Port Chester, that is, work not contemplated by the subcontract (referred to here as "base subcontract work"). The extra work was reflected in change orders comprised of both ICOs (internal change orders for which HBE, as architect, was responsible and which were not reimbursable by HBE from the Hospital) and OCOs (owner, *i.e.*, Hospital initiated change orders). The change orders include the amount of payments from HBE to Port Chester for its extra work. The amounts in the change orders reflect either a price negotiated between HBE and Port Chester or, where they could not agree or work was ordered on an emergency basis, a price based upon time and material tickets, which reflect the cost of labor, materials plus a profit percentage.

HBE issued a total of 63 change orders to Port Chester. The total amount of the change order work, $877,845, itself indicates the massiveness of the changes.

Port Chester was paid the subcontract price of $1,222,000 and was paid for all of its extra work, as reflected in the change orders. Port Chester sues here not for the cost of the extra work itself, but for the additional costs to its base subcontract work caused by the delays in its ability to complete that work. Its claim is limited to the period after January 1, 1984, because, in Change Order # 17, HBE and Port Chester agreed to an additional payment of $35,-000 to cover both extra work and any claims for delay damages through January 1, 1984. Defendants' argument that Change Order # 17 was intended by the parties to cover delays that had not yet occurred but would occur in the future is belied by the express language of Change Order # 17 that it covers "delays thru January 1, 1984," and by the testimony establishing the contemporaneous understanding of the negotiating parties.

The great bulk of the extra work on the Project occurred after January 1, 1984. Of the 63 change orders issued, none but Change Order # 17 covered delay damages claims. Nor was there any requirement that claims for delay damages to base subcontract work be included in the change orders. The extent to which extra work was delaying base subcontract work could not be fully determined until it was completed.

Port Chester, as the electrical subcontractor, was a "following trade," i.e., because of the nature of electrical work, Port Chester's work generally followed most of the other subcontractors at a given work site (although it also had to provide temporary electrical power throughout the Project and secure the safety of areas that were being demolished); and it did not leave the site until the Project was complete. It is undisputed that portions of Port Chester's base subcontract work could not be completed until after major change order work, performed by Port Chester itself and by other subcontractors, was completed. While every major construction project entails some degree of change order work, the evidence was overwhelming that in this case the extent of such work was unusual in scope and caused significant delay in completion of the Project including completion of Port Chester's base subcontract work.

A prime example involves the removal of asbestos. Although HBE was aware of the likelihood that asbestos would exist in a building of the age of the building to be renovated, and although the drawings furnished to HBE by the Hospital indicated the presence of asbestos, HBE did not take the removal of asbestos from the building, which was necessary to effect the renovations, into account in estimating its work on the Project. Therefore, when asbestos was encountered in an area, all work had to be suspended and an asbestos remover hired to remove it. This caused delays to the Project and specifically to Port Chester's work. While HBE and the Hospital disputed which of them was responsible for the delays, the delay assuredly was not attributable to Port Chester.

Delays by other subcontractors also delayed completion of Port Chester's base subcontract work. For example, Donaldson Acoustics failed to timely install the ceiling grids, into which Port Chester was to install the lighting fixtures. This significantly delayed completion of Port Chester's base subcontract work.

While it was part of Port Chester's agreement that the renovation work be done within the restrictions imposed by the Hospital's continuing to function during the life of the Project, changes imposed by the Hospital to the design of the Project created unanticipated delays of which HBE itself complained repeatedly to the Hospital. For example, the Hospital made major changes, causing many months of delay, regarding the construction of the new operating rooms and the renovation of the old operating rooms.

Another illustration of how changes by the owner, requiring supplemental drawings, caused delays to Port Chester occurred in the kitchen area. The Hospital used its own subcontractor to effect some of these changes, including digging up the entire floor and underground area, which extended the completion date of the kitchen

area well into 1986, even though the January 31, 1984 schedule of work issued by HBE indicated that this work would be completed by February 1985. Port Chester also encountered unanticipated problems, not of its making, with the fire alarm and nurse call systems, which had to be maintained during construction, since the Hospital's operations were ongoing. For example, because the smoke dampers were not installed by another subcontractor in timely fashion, it was necessary for Port Chester to complete its wiring of them, which was base subcontract work, after the ceilings had been installed, although that work is normally done prior to completion of the ceilings. Some could not be wired until 1986.

Defendants' argument that this case is about "work schedule" changes, which, under the subcontract cannot be the basis for increased payments, is without merit. Plaintiff does not seek recovery for mere changes in work schedule,[1] but for massive delays, which it has proved and for which HBE is responsible. *See Quaker–Empire Construction Co. v. D.A. Collins Construction Co.,* 88 A.D.2d 1043, 452 N.Y.S.2d 692 (3rd Dep't 1982).

The opinions of HBE witnesses that Port Chester's losses were the result of its own problems were without factual support. Wayne Zimmerman, vice-president of estimating for HBE, made an estimate that Port Chester had been 22% inefficient in its work, because it had experienced a loss in its first fifteen months on the Project and because, in his view, Port Chester had "overmanned" the job. This testimony was offered for the purpose of reducing Port Chester's damages by 22% to reflect damages caused not by HBE but by Port Chester itself. But Mr. Zimmerman's testimony was completely speculative and without factual foundation. He had no personal knowledge of the Project and was never at the site. Moreover, it was contradicted by other credible and persuasive evidence

from witnesses with detailed, personal knowledge of the work. Indeed, Port Chester established its efforts to be efficient, and to move the Project along, in the face of overwhelming odds. Mr. Mollica, an HBE superintendent on the Project, testified that, among the many problems on the job which delayed completion were problems with subcontractors, *not* including Port Chester.

In sum, Port Chester established that conduct for which it was not responsible and for which HBE was responsible, caused delays in the completion of its base subcontract work. It also established that these delays, which required it to be at the site two and a half years longer than expected, caused increased expense, principally from enhanced labor costs.

*Notice*

Defendants do not dispute that Port Chester's service and filing of its Amended Notice of Mechanic's Lien satisfied its notice obligation to Firemen's Fund Insurance Co. pursuant to the terms of its Payment Bond.

■ The dispute between the parties is whether the notice provisions of the contract between HBE and Nyack Hospital bind the plaintiff subcontractor. HBE relies upon Section 12.1.9 of the General Conditions, which provides that, "If HBE claims that additional cost is involved because of ... (4) any delay which is cause for the contract time to be extended under Paragraph 8.3.1., HBE shall make such claim as provided in Paragraph 12.2." Section 12.2.1 provides, "If HBE wishes to make a claim for an increase in the Contract Sum, it shall give the Architect and the Owner written notice thereof within thirty days after the occurrence of the event giving rise to such claim.... No such claim shall be valid unless so made." HBE argues that these provisions are incorporated into its subcontract with HBE.

---

1. The Court of Appeals has already held in this case that the clause in the subcontract dealing with the modification of work schedules "was not intended to be a 'no damages for delay' clause." *Port Chester Elec. Constr. Corp. v. HBE* *Corp.,* 894 F.2d 47, 49 (2d Cir.1990). The Court noted, with prescience, that "it is not at all unlikely that Port Chester's complaints are based, in part at least, upon its inability to complete its work according to 'schedule.' " *Id.*

Plaintiff argues that an incorporation clause in a construction subcontract binds the subcontractor only to those provisions of the prime contract which relate to the scope, quality, character and manner of the work. Plaintiff also argues that a mere blanket incorporation would not have fulfilled HBE's own contractual obligation to the Hospital to obtain specific consent from Port Chester to a notice provision which would have allowed HBE to make timely claims to the Hospital. In response, defendants argue that Port Chester is barred from making such contentions under the doctrine of judicial estoppel because of its express assertions to the Court of Appeals for the Second Circuit in a prior proceeding in this case that it *was* bound by the delay notice provision of the prime contract. *See Port Chester Elec. Const. Corp. v. HBE Corp.*, 894 F.2d 47, 49 (2d Cir.1990). Defendants further argue that Port Chester understood itself to be bound by these provisions.

It is unnecessary to resolve the dispute as to whether plaintiff was required to give written notice of the delay damages claim at issue here, for, based upon the credible evidence at trial, I am satisfied that ample notice, sufficient to comply with the provisions relied upon by the defendants, was provided to HBE.

There is no contractually required form for the notice other than that it be in writing. In a letter dated January 19, 1984, Felix Nasuti, Project Manager for Port Chester, wrote to HBE, in response to an "HBE Progress Schedule for Remaining New Construction & Incomplete Remodel Work," as follows (Ex. 25):

A review of the above presents problems which were not anticipated by any previous "Progress Schedules," nor was the intent of the original contract based upon such a schedule....

The above is completely incompatible with our planned job progress.

This schedule will result in very obvious unanticipated costs such as additional supervision, labor rate increases, additional extended overheads, job inefficiencies,

material costs increases and numerous other indirect impact costs.

Whether or not Nasuti called his letter a "notice of claim," clearly it served that function to HBE, as evidenced by the response from HBE. Matt DiGioia of HBE wrote to Nasuti on January 26, 1984 that "It's unfortunate that you have taken a posture, at this time, to lay the ground work for future fabricated delay claims." Ex. 27. He thus indicated his awareness that Port Chester was intending to assert delay claims. HBE's argument that this exchange of letters reflects pre–1984 delays which were settled between the parties in Change Order # 17 and are not part of this suit is rejected in light of the clear import of the letters that they, in DiGioia's word, are dealing with "future" costs.

Throughout the remainder of the Project, Port Chester sent written communications in the form of "speed memos" to HBE complaining of problems on the job, including delays to its base subcontract work, and urging HBE to attend to these problems. The evidence established that the purpose of these speed memos was to notify HBE of problems so that it could correct them and avoid additional costs.

HBE indicated its full awareness of subcontractor delay damages claims in its communications with the Hospital. Included in its own notices of delay to the Hospital were specific references to delays incurred by Port Chester and other subcontractors. Most tellingly, on July 5, 1985, HBE's comptroller Ronald Unterreiner, submitted a claim to the Hospital, including delay damages, which included the following statement (Ex. EE–12):

The changes to this project, initiated by the hospital, have caused great impact to our scheduling and costs all of which is not included totally in the attached summary. Further, we have serious concerns of delay claims being pursued by some of the subcontractors on the project over and above amounts paid to them for direct costs on extras. We are willing to forego these expenses and assume the risks involved in settling in full at this time in the interest of an expedi-

tious settlement inclusive of full payment of $2,202,406 and would hope we may move rapidly from here towards that goal.

At trial HBE sought to avoid the impact of this express admission of notice of subcontractor delay claims through the testimony of Unterreiner that his statement to the Hospital about subcontractor delay claims was made to induce the Hospital to agree to the settlement, but was "not true." Based upon my evaluation of Unterreiner's demeanor and testimony, and the surrounding circumstances, I find Unterreiner's testimony that he lied to the Hospital and actually had no notice of delay damage claims utterly unworthy of belief.

There can be no question but that the written notice provided was sufficient to accomplish the purposes of a notice requirement. HBE was fully aware of all of the delays upon which plaintiff here relies. It received continuing written communications from Port Chester's people on the job site advising HBE of the problems with completion of its work and urging HBE to attend to these problems. HBE acknowledged these delays in its own notices of delay to the Hospital. Thus, HBE was fully aware of the delays, so that it could make efforts to minimize the delays and their costs. As HBE argues, the purpose of a notice requirement is to inform a party of delay and afford it an opportunity to eliminate the cause of the delay. That purpose was amply met here.

In addition, the notice was sufficient to allow HBE an opportunity to protect itself in its claims against the Hospital for its own delay damages and that of its subcontractors. That is, HBE not only had notice of the delays but notice that the delays would result in claims for delay damages. In its settlement with the Hospital, HBE acknowledged its awareness of subcontractor delay claims and knowingly released the Hospital from them. That the settlement may have been improvident does not allow HBE to pretend that it acted without notice.

*Accord and Satisfaction*

■ Defendants' argument that plaintiff's acceptance of change orders constituted an accord and satisfaction for delay damages is without support. An accord and satisfaction, like any other contract, requires a meeting of the minds. *See Kramer, Levin, et al. v. Aronoff*, 638 F.Supp. 714, 724 (S.D.N.Y.1986); *Pepper's Steel & Alloys, Inc. v. Lissner Minerals*, 494 F.Supp. 487, 496 (S.D.N.Y.1979). For that reason, defendants' reliance on *Stellar Mfg. Co. v. Tenn. Valley Authority*, 707 F.Supp. 782 (E.D.Pa.1989), aff'd, 891 F.2d 283 (3rd Cir.1989), is misplaced. In *Stellar Mfg. Co.*, the court specifically found that two of the change orders at issue, Nos. 1 and 2, provided plaintiff with additional sums for all changes "and delays to date." 707 F.Supp. at 784. It was on the basis of those factual findings that the court in *Stellar Mfg. Co.* concluded that the change orders constituted an accord and satisfaction barring delay damages claims for the period prior to the agreed upon date. 707 F.Supp. at 789.

Here, the facts are different. Change Order #17 addressed above specifically waived delay damage claims for the period ending January 1, 1984. The other change orders, whether initiated by the Hospital or by HBE, covered new work not required by the contract, or additional expenses required by significant changes in the base subcontract work, but did not waive delay damage claims.

■ Payments for additional, or more costly, work by the subcontractor reflected in these change orders are distinct from delay damage claims, which are based upon delays in completion of base subcontract work. Thus, for example, Mr. Unterreiner distinguished between change order work and the additional costs sought as delay damages, in stating to the Hospital that "we have serious concerns of delay claims being pursued by some of the subcontractors on the project *over and above amounts paid to them for direct costs on extras.*" Ex. EE–12 (emphasis added). In sum, the mere acceptance of change orders which did not specify that delay damages

claims were being waived, did not constitute an accord and satisfaction of delay damages claims.

### Estoppel, Laches and Waiver

■ HBE argues that it relied to its detriment on plaintiff's silence when it entered into the July 1985 $2.5 million settlement with Nyack Hospital. That settlement precludes HBE from passing on any of plaintiff's claims to the Hospital. HBE contends that, as a result, plaintiff's claim is barred by principles of estoppel, laches and waiver. Since Unterreiner acknowledged to the Hospital the existence of potential delay damage claims from the subcontractors, it is clear that HBE was fully aware of the claims and these doctrines have no applicability.

### Damages

■ The burden of course is on the plaintiff both to prove that conduct for which defendants are responsible caused it damage and to prove the extent of the damage caused. *Berley Industries, Inc. v. City of New York*, 45 N.Y.2d 683, 686, 412 N.Y.S.2d 589, 385 N.E.2d 281 (1978). Delay damage claims are no exception to this general rule. *Id.* at 686, 412 N.Y.S.2d 589, 385 N.E.2d 281.

"Particularly in actions ex contractu, however, when it is clear that some injury has been occasioned, recovery will not necessarily be denied a plaintiff when it is apparent that the quantum of damage is unavoidably uncertain, beset by complexity or difficult to ascertain.... The law is realistic enough to bend to necessity in such cases. A jury then may draw reasonable inferences from the other, though lesser, proofs actually presented in order to arrive at an estimate of the amount of extra costs which are the natural and probable result of the delay.... Even then there must be a definite and logical connection between what is proved and the damages a jury is asked to find." [Citations omitted.] *Id.* at 687, 412 N.Y.S.2d 589, 385 N.E.2d 281.

### Pre-bid Estimate Theory

■ Plaintiff first seeks damages under a method which compares its pre-bid estimation of the labor hours it would require to complete the work on the subcontract with the number of labor hours it actually expended. The New York courts have uniformly condemned such a method of ascertaining damages as speculative and unreliable and have not permitted its use. *E.g., Najjar Industries, Inc. v. City of New York*, 87 A.D.2d 329, 332, 451 N.Y.S.2d 410 (1st Dep't 1982), *aff'd mem.* 68 N.Y.2d 943, 510 N.Y.S.2d 82, 502 N.E.2d 997 (1986); *Whitmyer Bros. v. State of New York*, 63 A.D.2d 103, 108, 406 N.Y.S.2d 617 (3rd Dep't 1978), *aff'd mem.*, 47 N.Y.2d 960, 419 N.Y.S.2d 954, 393 N.E.2d 1027 (1979); *Manshul Constr. Corp. v. State of New York*, 79 A.D.2d 383, 387, 436 N.Y.S.2d 724 (1st Dep't 1981); *Fehlhaber v. State of New York*, 69 A.D.2d 362, 368, 419 N.Y.S.2d 773 (3rd Dep't 1979).

Port Chester argues that this body of law is not applicable here because "The evidence submitted by Port Chester is neither subjective nor unrealistic." Pltf's. Br., p. 48. It relies on the fact that HBE's own pre-bid estimate of the labor hours that would be required of the electrical subcontractor was lower than that of Port Chester, and it notes that, as a result, a damage calculation based upon HBE's pre-bid estimate would be even larger than what plaintiff seeks. But this circumstance does not alter the fundamental reasoning of the New York Courts; under New York law, HBE's pre-bid estimate is no more reliable than plaintiff's. *See Najjar*, 87 A.D.2d at 332, 451 N.Y.S.2d 410 (rejecting method of calculating damages based in part upon pre-bid estimates of costs made by a city official).

*Manshul Constr. Corp. v. Dormitory Authority*, 111 Misc.2d 209, 444 N.Y.S.2d 792 (Sup.Ct. Kings Co.1981), *aff'd*, 88 A.D.2d 794, 450 N.Y.S.2d 644 (2d Dep't 1982), relied upon by plaintiff, is not to the contrary. As the court stated, at p. 217, 444 N.Y.S.2d 792, "plaintiff Manshul did not ask the jury to rely on its prebid estimates." Rather, the court allowed the jury to consider the pre-bid estimates, along with other evidence, solely for the purpose

of making an allocation as to what part of plaintiff's costs were labor costs, but not to find actual dollar amounts of damage.

*Quantum Meruit*

■ Plaintiff may, however, proceed under its "alternate theory," quantum meruit. Under New York law, if Port Chester establishes that HBE has breached the subcontract by inordinate delays affecting Port Chester's ability to complete its obligations under the subcontract, Port Chester "may disregard the contract figures and proceed on a quantum meruit basis." *Najjar Industries, Inc. v. City of New York,* 87 A.D.2d 329, 333, 451 N.Y.S.2d 410 (1st Dep't 1982); *Fehlhaber Corp. v. State of New York,* 65 A.D.2d 119, 127, 410 N.Y.S.2d 920 (3rd Dep't 1978), *leave denied,* 48 N.Y.2d 604, 421 N.Y.S.2d 1029, 396 N.E.2d 486 (1979). "The customary method of calculating damages on a quantum meruit basis in construction contract cases both on completed contracts and contracts terminated before completion is actual job costs plus an allowance for overhead and profit minus amounts paid. (*Whitmyer Bros. v. State of New York,* 47 N.Y.2d 960, 962 [419 N.Y.S.2d 954, 393 N.E.2d 1027], aff'g 63 A.D.2d 103 [406 N.Y.S.2d 617]; *Fehlhaber Corp. v. State of New York,* 65 A.D.2d 119, 127 [410 N.Y.S.2d 920]; 69 A.D.2d 362, 368 [419 N.Y.S.2d 773])." *Najjar Industries, Inc.,* 87 A.D.2d at 331–332, 451 N.Y.S.2d 410.

■ Defendants recognize the validity, under New York law, of quantum meruit recovery in delay damages cases, but argue that plaintiff's use of that method here is improper because plaintiff has eliminated in its calculations those sums which reflect its project costs paid through December 31, 1983 and those sums which reflect the work performed through December 31, 1983, when plaintiff and HBE, in Change Order # 17, settled any then-existing delay claims in a lump sum agreement. Defendants' argument is without merit. Plaintiff has correctly adjusted its total cost figures to eliminate that portion of its total costs and, correspondingly, that portion of the dollar value of the work performed, prior to the date of the settlement. Since all delay claims as of December 31, 1983 had been settled between the parties, plaintiff's elimination of this period from its calculations of damages constitutes an appropriate adjustment to its total costs and payments, so as to more accurately approximate the reasonable value of the work for which it is entitled to recover. *See Berley Industries, Inc.,* 45 N.Y.2d 683, 412 N.Y.S.2d 589, 385 N.E.2d 281.

Plaintiff has also correctly calculated its adjustment to total costs for the pre-January 1, 1984 period. Defendants do not dispute plaintiffs' figure for its project costs prior to that date. Defendants argue, however, that what should be subtracted from that sum should be the sum actually paid over to plaintiff by HBE as of that date, which is approximately $300,000 less than the sum used by plaintiff. Plaintiff's figure reflects not payments made by HBE by December 31, 1983, but instead the amounts earned as of December 31, 1983, in other words, the dollar value of the work performed as of that date. This figure is reflected in its Requisition 14. Plaintiff argues, correctly, that in order to accurately determine "the status of Port Chester's account as of December 31, 1983, Port Chester must be given credit, not only for the amount paid by HBE, but for all the work which it had performed (i.e., the value thereof) *and approved by HBE* as established in Requisition 14 and never challenged by HBE." Pltf's Reply Br., p. 30.

HBE has not challenged the accuracy of Requisition 14 as properly reflecting the value of the work completed by Port Chester as of December 31, 1983. Clearly, the value of work performed as of December 31, 1983 cannot depend on the happenstance of whether plaintiff had a check in hand for all of that work by that date. Accordingly, plaintiff's figure will be accepted. Moreover, that most of the cost overrun occurred in the post–1983 period is consistent with the trial evidence, which overwhelmingly established that most of the delays occurred during that period.

■ Properly included in plaintiff's quantum meruit claim are amounts reflecting plaintiff's overhead expenses and profit

on its costs. *E.g., Fehlhaber Corp.,* 69 A.D.2d at 372, 419 N.Y.S.2d 773; *Manshul Construction v. Dormitory Authority,* 79 A.D.2d 383, 390–91, 436 N.Y.S.2d 724 (1st Dep't 1981). Plaintiff has based its claim for overhead, 9.44%, on an average of the actual overheads incurred by Port Chester on all outstanding contracts as reflected on its financial statements.[2] It has also applied a 5% profit factor to the sum of its project costs and overhead. These figures are necessarily somewhat arbitrary, but the New York courts not only have recognized the entitlement of a plaintiff in the situation of Port Chester to overhead and profit on its costs but also have recognized the impossibility of exactitude is determining the proper percentages to apply. *See e.g., Westcott v. State of New York,* 264 A.D. 463, 464, 36 N.Y.S.2d 23 (3rd Dep't 1942) (sustaining the trial court's "arbitrary allowance of fifteen percent for overhead"); *Port Chester Electrical Co., Inc. v. State of New York,* 103 A.D.2d 825, 826, 478 N.Y.S.2d 61 (2nd Dep't 1984) (without specifying the basis for the percentages used, upholding a 10% overhead figure and an 8% profit figure in a total costs calculation of delay damages on a completed contract); *Fehlhaber Corp.,* 65 A.D.2d at 126, 410 N.Y.S.2d 920 ("an allowance of 10% for overhead has been found to be fair and reasonable compensation"). Defendants complain that the figures plaintiff uses result in a higher total of overhead and profit than would apply had plaintiff's invalid estimated costs approach to damages been accepted, but that is no ground for disallowing the claim. The claim for overhead of 9.44% and profit of 5% is accepted.

▮ Finally, I note that much of defendants' complaint that plaintiff has failed to establish that its damages were caused by delays for which HBE is responsible is based upon an apparent misapprehension of the effect of applying quantum meruit recovery here. Once Port Chester has established, and I am satisfied it has, that inordinate delays which were not of its own

making but rather were the responsibility of HBE caused delay in its completion of base subcontract work and that that delay caused it injury, principally from enhanced labor costs, Port Chester is free to forego the contract price and seek quantum meruit recovery; and once it does so, it is not necessary for it to link each item of delay directly to a particular increased cost. Indeed, by allowing for quantum meruit recovery in cases such as this, the New York courts are effectively acknowledging the difficulty, if not impossibility, of calculating delay damages in the fashion suggested by defendants. Only at the conclusion of the delay period, here amounting to the end of the Project (for Port Chester was completing base subcontract work to the very end), could the extent of delay damage be calculated.

While, as defendants argue and Port Chester's witnesses candidly acknowledged, not every change caused delay to Port Chester's work, Port Chester is entitled, under quantum meruit, to full recovery of its costs. Similarly, that Port Chester's witnesses testified that they were willing to "eat" some minor delays that occurred, at the time they were occurring, does not bar them from quantum meruit recovery for all of their costs, now that the Project has been completed. There were a wide variety of delays, some overlapping, attributable to HBE, to the owner and to other subcontractors, for all of which HBE is responsible vis-a-vis Port Chester, which contributed to Port Chester's inability to complete its base subcontract work in timely fashion. Under these circumstances, a quantum meruit recovery, fully sanctioned by the New York courts in evident recognition of the difficulties inherent in other methods of calculating delay damages, is appropriate, and Port Chester was not required to calculate the extent to which each delay resulted in increased costs. The testimony established that such an effort would have been inordinately complex and

**2.** The actual calculation was done on Exhibit 44. While defendants objected to the admission of this exhibit on grounds relating to the pre-bid estimate theory, which has not been accepted, they did not object to the accuracy of the calculation of actual overhead (See trial transcript, pp. 539–540) and do not do so in their post-trial briefs.

difficult. *See Columbia Asphalt Corp. v. State of New York,* 70 A.D.2d 133, 137, 420 N.Y.S.2d 36 (3rd Dep't 1979), *leave denied,* 49 N.Y.2d 702, 426 N.Y.S.2d 1027, 403 N.E.2d 459 (1980). ("Although the Court of Claims correctly noted that there was a lack of evidence concerning the length of delay attributable to each sign [which caused interference with the contractor's ability to do its work], we are of the view that due to the nature of the delays such proof would have been, for all practical purposes, impossible to produce").

*Calculations*

Port Chester's damages under quantum meruit are calculated as follows:

| | | |
|---|---|---|
| A. | PORT CHESTER'S TOTAL PROJECT COSTS: | $2,719,608.35 |
| B. | PORT CHESTER'S PROJECT COSTS PAID THROUGH DECEMBER 31, 1983: | ($1,215,871.88) |
| C. | PORT CHESTER'S PROJECT COSTS FROM JANUARY 1, 1984 TO COMPLETION (A less B): | $1,503,736.47 |
| D. | TOTAL AMOUNT PAID BY HBE TO PORT CHESTER: | $2,099,845.78 |
| E. | AMOUNT OF PORT CHESTER'S WORK EARNED THROUGH DECEMBER 31, 1983: | ($1,203,648.68) |
| F. | AMOUNT OF PORT CHESTER'S WORK EARNED FROM JANUARY 1, 1984 TO COMPLETION (D less E): | $ 896,197.10 |

Subtracting $896,197.10 from $1,503,736.47, Port Chester's project costs from January 1, 1984 to completion ("C"), yields excess costs (exclusive of overhead and profit) of $607,539.37.

■ To obtain overhead and profit figures, Port Chester has added its 9.44% overhead and 5% profit figures to its project costs during the delay period and then subtracted the amounts received during that period. This calculation is consistent with the calculations used in *Whitmyer,* 47 N.Y.2d at 960, 419 N.Y.S.2d 954, 393 N.E.2d 1027 and *Port Chester Electrical Co. Inc.,* 103 A.D.2d at 826, 478 N.Y.S.2d 61. *See Fehlhaber Corp.,* 69 A.D.2d at 372 n. 6, 419 N.Y.S.2d 773. The calculation follows:

| | |
|---|---|
| Port Chester's Costs During Delay Period (C above) | $1,503,736.47 |
| Overhead at 9.44% | $ 141,952.72 |
| | $1,645,689.44 |
| Profit at 5% | $ 82,284.47 |
| Port Chester's Total Costs During Delay Period (including Overhead and Profit) | $1,727,973.91 |
| HBE payments During Delay Period (F above) | $ (896,197.10) |
| Total Delay Damages Including Overhead and Profit | $ 831,776.81 |

848

In addition, under New York Civil Practice Law and Rules § 5001, plaintiff is entitled to prejudgment interest. N.Y.Civ. Prac.L. & R. § 5001 (McKinney 1962); *Arrow, Edelstein & Gross v. Rosco Productions,* 581 F.Supp. 520, 524 (S.D.N.Y.1984) (applying Section 5001 to a quantum meriut suit). Interest should be calculated from June 30, 1986, the last date on which Port Chester performed work on the Project.

In sum, plaintiff is entitled to judgment in the amount of $831,776.55, plus prejudgment interest from June 30, 1986. The Clerk is directed to enter judgment.

SO ORDERED.